**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                                     No. CR 24-1402 JB

OBETH TALAMANTE-SANCHEZ AND
JOSE TALAMANTE-SANCHEZ,

      Defendants.

**<u>MEMORANDUM OPINION AND ORDER</u>**

**THIS MATTER** comes before the Court on: (i) the Defendant Obeth Sanchez's Opposed Motion to Suppress Evidence, filed March 21, 2025 (Doc. 35)("O. Talamante-Sanchez Motion to Suppress"); and (ii) the Defendant Jose Talamante-Sanchez' Motion to Suppress Evidence, filed June 23, 2025 (Doc. 51)("J. Talamante-Sanchez Motion to Suppress"). The Court held an evidentiary hearing on July 1, 2025. <u>See</u> Clerk's Minutes at 1, filed July 1, 2025 (Doc. 57)("Minutes"). The primary issues are: (i) whether New Mexico State Police Agent and Homeland Security Investigations Task Force Officer Juan Rodriguez conducts a traffic stop lawfully after observing Defendant Obeth Talamante-Sanchez driving without an illuminated license plate; (ii) whether, after the traffic stop concludes, Rodriguez' additional questioning of O. Talamante-Sanchez is lawful; and (iii) whether Rodriguez, New Mexico State Police Officer Austin Sanchez, and Bureau of Indian Affairs Law Enforcement Officer Nicholas Jackson search the vehicle lawfully when they partially dismantle the vehicle and use a portable x-ray machine to search for drugs. The Court concludes that: (i) the traffic stop is lawful, because Rodriguez has reasonable suspicion that O. Talamante-Sanchez' license plate is not illuminated properly, in violation of N.M.S.A. § 66-3-805(C), and the stop is reasonably related in scope to issuing a traffic

ticket; (ii) Rodriguez' additional questioning of O. Talamante-Sanchez is lawful, because: (a) O. Talamante-Sanchez consents freely to additional questioning; and (b) even if O. Talamante-Sanchez does not consent freely, Rodriguez extends the traffic stop lawfully, because he has reasonable suspicion that O. Talamante-Sanchez has committed another crime; and (iii) the vehicle search is lawful, because O. Talamante-Sanchez consents expressly and freely to a full search of the truck. Accordingly, the Court denies the O. Talamante-Sanchez Motion to Suppress and the J. Talamante-Sanchez Motion to Suppress.

## FINDINGS OF FACT

Rule 12(d) of the Federal Rules of Criminal Procedure requires that the Court state its essential findings on the record when deciding a motion that involves factual issues. See Fed. R. Crim. P. 12(d)("When factual issues are involved in deciding a motion, the court must state its essential findings on the record."). The findings of fact in this Memorandum Opinion and Order serve as the Court's essential findings for rule 12(d)'s purposes. The Court makes these findings under rule 104(a) of the Federal Rules of Evidence, which requires a judge to decide preliminary questions relating to the admissibility of evidence, including the legality of a search or seizure. See United States v. Merritt, 695 F.2d 1263, 1269-70 (10th Cir. 1982). In deciding such preliminary questions, the other Federal Rules of Evidence, except those with respect to privileges, do not bind the Court. See Fed. R. Evid. 104(a)("The court must decide any preliminary question about whether a witness is qualified, a privilege exists, or evidence is admissible. In so doing, the court is not bound by evidence rules, except those on privilege."). Thus, the Court may consider hearsay in ruling on a motion to suppress. Additionally, the United States Court of Appeals for the Tenth Circuit has indicated that the restrictions in the Confrontation Clause of the Sixth Amendment to the Constitution of the United States do not apply to hearsay introduced in suppression hearings, so the Court may consider testimonial statements. See United States v.

Lopez-Carillo, 536 F. App'x 762, 768-69 (10th Cir. 2013)(unpublished)[1]("[T]he Supreme Court

has made it clear hearsay is admissible in suppression hearings . . . . As a result, the restriction in

the Confrontation Clause against admission of testimonial statements . . . is not implicated here."

(citing United States v. Matlock, 415 U.S. 164, 172-77 (1974); United States v. Sanchez, 555 F.3d

910, 922 (10th Cir. 2009); and United States v. Miramonted, 365 F.3d 902, 904 (10th Cir. 2004)).

      1.      At approximately 2:00 a.m. on September 9, 2024, O. Talamante-Sanchez, with his

brother, J. Talamante-Sanchez, in the passenger seat, drives past Rodriguez, who is parked on the

paved median of Interstate 40 in Bernalillo County, New Mexico, facing eastbound traffic. See

Draft Transcript of July 1, 2025, Hearing at 23:3-22:15 (Vasquez, Rodriguez)(taken July 1,

2025)("Tr.").[2]

---

[1]United States v. Lopez-Carillo, 536 F. App'x 762 (10th Cir. 2013), is an unpublished
opinion, but the Court can rely on an unpublished Tenth Circuit opinion to the extent its reasoned
analysis is persuasive in the case before it. See 10th Cir. R. 32.1(A) ("Unpublished decisions are
not precedential, but may be cited for their persuasive value."). The Tenth Circuit states:

> In this circuit, unpublished orders are not binding precedent, . . . and we have
> generally determined that citation to unpublished opinions is not favored . . . .
> However, if an unpublished opinion or order and judgment has persuasive value
> with respect to a material issue in a case and would assist the court in its disposition,
> we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005). The Court concludes that United
States v. Lopez-Carillo; United States v. Blake, 284 F. App'x 530 (10th Cir. 2008); United States
v. Stewart, 273 F. App'x 768 (10th Cir. 2008); United States v. Reed, 195 F. App'x 815, (10th Cir.
2006); United States v. Wilson, 96 F. App'x 640 (10th Cir. 2004); United States v. Burciaga-
Burciaga, 147 F. App'x 725 (10th Cir. 2005); United States v. Farmer, 215 F.3d 1338 (10th Cir.
2000); and United States v. Marquez-Diaz, 325 F. App'x 637 (10th Cir. 2009); have persuasive
value with respect to a material issue, and will assist the Court in its disposition of this
Memorandum Opinion and Order.

[2]The Court's citations to the transcript of the hearing refer to the court reporter's original,
unedited version; any final transcript may contain slightly different page and/or line numbers

2.      O. Talamante-Sanchez is driving eastward on Interstate 40.  See Dash Camera Footage at 0:00-1:00 (dated September 9, 2024)(admitted as Defense Exhibit A at Suppression Hearing on July 1, 2025)("Dash Camera Footage").

3.      After O. Talamante-Sanchez' vehicle drives past Rodriguez' headlights, Rodriguez observes that O. Talamante-Sanchez' rear license plate is not illuminated independently in a way that makes it clearly legible from fifty feet away.[3]  See Tr. at 22:15-19; Lapel Camera Footage at

_____

[3]The Defendants dispute this fact and argue that the license plate is illuminated properly. See O. Talamante-Sanchez Motion to Suppress at 6-8; J. Talamante-Sanchez Motion to Suppress at 6-8.  To support their position, the Defendants highlight two pieces of evidence: the dash camera footage and a video recording made two months after the incident, where Karina Titus, the Chief Investigator for the Federal Public Defender's Office, tests the lightbulbs next to the license plate. See O. Talamante-Sanchez Motion to Suppress at 6-8 (citing Dash Camera Footage (dated September 9, 2024)(admitted as Defense Exhibit A at Suppression Hearing on July 1, 2025)("Dash Camera Footage"); United States Department of Transportation, Manual on Uniform Traffic Control Devices for Streets and Highways at 348 (undated)(2009 edition)(admitted as Defense Exhibit C at Suppression Hearing on July 1, 2025)("Traffic Control Manual"); Investigator Footage (dated November 5, 2024)(admitted as Defense Exhibit D at Suppression Hearing on July 1, 2025)("Investigator Footage"); Investigator Photograph at 1 (dated November 5, 2024)(admitted as Defense Exhibit E at Suppression Hearing on July 1, 2025)("Investigator Photograph")); J. Talamante-Sanchez Motion to Suppress at 6-8.  The Dash Camera Footage shows Rodriguez following the Defendants from at least fifty feet away.  See O. Talamante-Sanchez Motion to Suppress at 6-7 (noting that "the broken lines on any interstate in New Mexico will be 10 feet long and the intervening gaps will be 30 feet long," and identifying a snapshot from the Dash Camera Footage that shows at least two broken white lines between Rodriguez' vehicle and O. Talamante-Sanchez' vehicle).  According to the Defendants, the Dash Camera Footage also shows that, during Rodriguez' pursuit, the Defendants' license plate is clearly illuminated. Additionally, the Defendants assert that their private investigator inspects O. Talamante-Sanchez' vehicle on November 5, 2024 -- nearly two months after the challenged incident -- and discovers that the license plate light bulbs "function as designed."  O. Talamante-Sanchez Motion to Suppress at 7 (citing Investigator Footage and Investigator Photograph at 1).

In response, the United States makes two points.  First, the United States argues that the Dash Camera Footage does not show that the license plate is independently illuminated.  See United States' Response to Defendant Obeth Talamante Sanchez' Opposed Motion to Suppress Evidence at 7-8, filed April 4, 2025 (Doc. 42)("O. Talamante Sanchez Motion to Suppress Response"); United States' Response to Defendant Jose Talamante Sanchez' Motion to Suppress Evidence at 7-8, filed June 27, 2025 (Doc. 54)("J. Talamante-Sanchez Motion to Suppress Response").  Rather, the United States maintains that the license plate is visible only "because it was being illuminated by the headlights of Officer Rodriguez' patrol vehicle."  O. Talamante-Sanchez Motion to Suppress Response at 7-8 (citing Dash Camera Footage and noting that "the

entire rear of the truck -- including the tailgate, bumper, rear axle, and license plate -- were illuminated by the headlights of Officer Rodriguez' patrol vehicle"); J. Talamante-Sanchez Motion to Suppress Response at 7-8 (same).  Second, the United States argues that the Lapel Camera Footage shows that, later in the evening, when O. Talamante-Sanchez walks in between the two parked vehicles, his shadow blocks his headlights' glare, and the license plate appears dark in the shadow.  See O. Talamante-Sanchez Motion to Suppress Response at 8-9 (citing Lapel Camera Footage at 10:21; id. at 52:10); J. Talamante-Sanchez Motion to Suppress Response at 8-9 (same).

The United States has the better argument.  N.M.S.A. § 66-3-805(C) provides:

> Either a tail lamp or a separate lamp shall be so constructed and placed as to illuminate with a white light the rear registration plate and render it clearly legible from a distance of fifty feet to the rear.  Any tail lamp, together with any separate lamp for illuminating the rear registration plate, shall be so wired as to be lighted whenever the headlamps or auxiliary driving lamps are lighted.

N.M.S.A. § 66-3-805(C).  The statute's plain language requires that license plates are independently illuminated; a trailing vehicle's headlights do not cut it.  See N.M.S.A. § 66-3-805(C).  The Dash Camera Footage does not show, one way or the other, whether O. Talamante-Sanchez' license plate is independently illuminated, because Rodriguez' headlights illuminate the entire rear of O. Talamante-Sanchez' vehicle.  See Dash Camera Footage at 0:00-1:00.  The Lapel Camera Footage shows, however, that the license plate is not illuminated independently sufficiently.  When O. Talamante-Sanchez walks between the two parked vehicles, his shadow darkens the license plate completely.  See Lapel Camera Footage at 10:21.  At this moment, O. Talamante-Sanchez' vehicle is parked, and his taillights are lit.  See Lapel Camera Footage at 10:21.  According to N.M.S.A. § 66-3-805(C), O. Talamante-Sanchez' vehicle should have a separate light that renders the license plate "clearly legible from a distance of fifty feet to the rear" under these conditions.  N.M.S.A. § 66-3-805(C).  As the Lapel Camera Footage shows, O. Talamante-Sanchez' license plate almost is completely dark when O. Talamante-Sanchez blocks his headlights temporarily, demonstrating that the license plate is not independently illuminated in accordance with N.M.S.A. § 66-3-805(C).  See Lapel Camera Footage at 10:21.

The Defendants' investigative work does not persuade the Court to reach another conclusion.  As the United States admits, O. Talamante-Sanchez' vehicle has dim lights in the bumper's recess, which slightly illuminate the license plate from the side.  See O. Talamante-Sanchez Motion to Suppress Response at 9.  These recess lights do not however, provide a "white light," which renders the license plate "clearly legible from a distance of fifty feet to the rear." N.M.S.A. § 66-3-805(C).  Titus takes a video and a photograph of these dim, yellow recess lights functioning properly.  See Investigator Footage at 0:00-0:30; Investigator Photograph at 1.  Titus conducts her investigative work during the day, and she takes her video and photograph from much less than fifty feet away from vehicle.  See Investigator Footage at 0:00-0:30; Investigator Photograph at 1.  The Investigator Footage and the Investigator Photographs shows only what the United States readily admits: that the dim, yellow recess lights function properly.  See Investigator Footage at 0:00-0:30; Investigator Photograph at 1; O. Talamante-Sanchez Motion to Suppress Response at 9.  This evidence does not show that, on September 9, 2024, O. Talamante-Sanchez' vehicle had a functioning white lamp that renders its license plate clearly visible from fifty feet away.  See Investigator Footage at 0:00-0:30; Investigator Photograph at 1.

10:21 (dated September 9, 2024)(admitted as Defense Exhibit B at Suppression Hearing on July 1, 2025)("Lapel Camera Footage"); id. at 52:10.

4.      Rodriguez turns onto I-40 and follows the Defendants eastward.  See Dash Camera Footage at 0:00-1:00; Tr. at 23:8-10 (Rodriguez).

5.      The Defendants speak only Spanish, and Rodriguez speaks some Spanish, but he is not fluent.  See J. Talamante-Sanchez Motion to Suppress at 2-3; J. Talamante-Sanchez Tr. at 27:18-28:2 (Vasquez, Rodriguez).

6.      Rodriguez pulls over the Defendants just east of the Route 66 Casino in Bernalillo County, New Mexico.  See July 1, 2025, Tr. at 59:10-22 (Vasquez, Rodriguez); Dash Camera Footage at 1:00-1:25.

---

Rodriguez' testimony points in the same direction that the physical evidence suggests. Rodriguez testifies clearly, consistently, and confidently that O. Talamante-Sanchez' license plate is not illuminated properly.  See Tr. at 22:14-19 (Rodriguez); id. at 59:3-6 (Gorman, Rodriguez); id. at 78:24-80:1 (Glanz, Rodriguez).  Rodriguez' testimony is based on substantial personal experience, because he conducts a lengthy traffic stop and has ample opportunity to observe the license plate.  Rodriguez' testimony aligns with the Lapel Camera Footage, which shows his shadow blacking out the license plate.  See Lapel Camera Footage at 10:21; id. at 52:10.  Under these circumstances, the Court finds Rodriguez' testimony to be credible, and -- considering all of the evidence on this issue -- the Court concludes that O. Talamante-Sanchez' license plate is not illuminated in a way that makes it clearly legible from fifty feet away.  See United States v. Garman., No. CR 23-1164 JB, 2025 WL 2210031, at *4 & n.3 (D.N.M. Aug. 4, 2025)(Browning, J.)(resolving a factual dispute in the United States' favor and concluding that a testifying officer is credible, where the officer's testimony on the disputed fact is internally consistent and aligns with lapel camera footage); United States v. Garcia, No. CR 24-0092 JB, 2025 WL 1518816, at *2-3 & nn.4-5 (D.N.M. May 28, 2025)(Browning, J.)(resolving factual disputes in the United States' favor, where the officers' sworn affidavits are consistent with one another and align with dash camera footage); United States v. Ringleb, No. CR 22-0190 JB, 2025 WL 1148544, at *5 & n.6 (D.N.M. Apr. 18, 2025)(Browning, J.)(resolving a factual dispute in the United States' favor and concluding that a testifying officer is credible on the disputed fact, where the officer's testimony aligns with belt tape audio recordings).  Cf. United States v. Hyler-Williams, No. 23-CR-01224-DHU, 2025 WL 1643094, at *8-9 (D.N.M. June 9, 2025)(Urias, J.)(concluding that an officer's testimony is not credible, where the officer's testimony conflicts with dash camera footage, which shows that the officer had only a "fraction of a second" to make the observation to which he testifies).

7.      Driving a separate patrol vehicle, Sanchez arrives at the scene to assist Rodriguez with the ensuing traffic stop, and Sanchez pulls in his patrol vehicle behind Rodriguez' vehicle before Rodriguez exits his patrol vehicle.  See United States' Response to Defendant Jose Talamante Sanchez' Motion to Suppress Evidence at 2 n.2, filed June 27, 2025 (Doc. 54)("J. Talamante-Sanchez Motion to Suppress Response"); Lapel Camera Footage at 1:00-1:15.

8.      Rodriguez exits his patrol vehicle, approaches the Defendants' truck, and knocks on the front passenger's window.  See O. Talamante-Sanchez Motion to Suppress Response at 11; J. Talamante-Sanchez Motion to Suppress Response at 11; Lapel Camera Footage at 1:15-1:30; Dash Camera Footage at 1:30-2:00.

9.      Sanchez follows closely behind Rodriguez and stands next to him while Rodriguez speaks with the Defendants, who are inside the truck.  See Dash Camera Footage at 1:30-2:20.

10.     After J. Talamante-Sanchez rolls down the passenger-side window, Rodriguez, alternating between Spanish and English, identifies himself as a law enforcement officer, says that he pulled the Defendants over because of the license plate's light, and asks for O. Talamante-Sanchez' driver's license and registration.  See Lapel Camera Footage as 1:30-1:45.

11.     Speaking Spanish, Rodriguez asks O. Talamante-Sanchez to come to his patrol vehicle.  See Lapel Camera Footage at 1:45-2:00.

12.     O. Talamante-Sanchez exits the truck and walks around to the truck's rear to meet Rodriguez.  See Lapel Camera Footage at 1:00-2:10.

13.     After O. Talamante-Sanchez exits the truck, Sanchez speaks with J. Talamante-Sanchez, who is still inside the truck.  See Dash Camera Footage at 2:20-2:50.

14.    Speaking Spanish, Rodriguez asks O. Talamante-Sanchez if he has any weapons, and O. Talamante-Sanchez says he does not have any weapons.  <u>See</u> Lapel Camera Footage at 2:10-2:25.

15.    Rodriguez pats down O. Talamante-Sanchez and confirms that he is not armed.  <u>See</u> Lapel Camera Footage at 2:25-2:35.

16.    Speaking Spanish, Rodriguez tells O. Talamante-Sanchez to sit in his patrol vehicle's front seat and close the door behind him.  <u>See</u> Lapel Camera Footage at 2:35-2:50.

17.    After O. Talamante-Sanchez and Rodriguez enter the patrol vehicle, Sanchez asks J. Talamante-Sanchez to exit the truck and stand in front of it while Sanchez runs a drug detection dog around the truck.  <u>See</u> O. Talamante-Sanchez Motion to Suppress at 2 n.2; Dash Camera Footage at 2:50-4:20; Tr. at 29:10-13 (Rodriguez).

18.    Back in the patrol vehicle, O. Talamante-Sanchez tells Rodriguez that he does not speak English, and Rodriguez tells him, in Spanish, that he is going to use a translator to communicate.  <u>See</u> Lapel Camera Footage at 2:50-3:00.

19.    Rodriguez calls Lionbridge Translation Services, identifies himself as a police officer, tells the translator that he is conducting a traffic stop, and asks the translator to introduce herself to O. Talamante-Sanchez.  <u>See</u> Lapel Camera Footage at 3:00-4:05.

20.    The translator introduces herself to O. Talamante-Sanchez, and O. Talamante-Sanchez confirms that he can hear her.  <u>See</u> Lapel Camera Footage at 4:05-4:15.

21.    Through the translator, Rodriguez tells O. Talamante-Sanchez that he stopped him, because "you don't have a light that's illuminating your license plate."  Lapel Camera Footage at 4:15-4:45.

- 8 -

22.     Through the translator, O. Talamante-Sanchez tells Rodriguez that the truck belongs to his brother-in-law, who is lending it to O. Talamante-Sanchez.  See Lapel Camera Footage at 4:45-5:15.

23.     Through the translator, Rodriguez tells O. Talamante-Sanchez that he stopped him, because the license plate is not illuminated in way that makes it legible from fifty feet away.  See Lapel Camera Footage at 5:15-5:40.

24.     Through the translator, Rodriguez tell O. Talamante-Sanchez that he is going to give him a written warning for the traffic violation.  See Lapel Camera Footage at 5:40-6:05.

25.     While he processes the traffic violation, Rodriguez asks O. Talamante-Sanchez about his travel, and O. Talamante-Sanchez tells him that he and his brother, J. Talamante-Sanchez, were visiting his sister in Gallup, New Mexico for one week, but O. Talamante-Sanchez is not able to provide his sister's address.   See O. Talamante-Sanchez Motion to Suppress Response at 2; Lapel Camera Footage at 6:25-9:10.

26.     During this first conversation inside the patrol vehicle, O. Talamante-Sanchez appears nervous.  See Dash Camera Footage at 5:30-10:00.

27.     Rodriguez asks O. Talamante-Sanchez to exit the patrol vehicle while Rodriguez confirms the truck's vehicle identification number ("VIN").  See O. Talamante-Sanchez Motion to Suppress Response at 2; Lapel Camera Footage at 9:10-9:45.

28.     Rodriguez walks over to the truck and tells J. Talamante-Sanchez -- who is still standing at the truck's front -- that Rodriguez is checking the truck's VIN.  See O. Talamante-Sanchez Motion to Suppress Response at 2; Lapel Camera Footage at 9:45-10:45.

29.     While he checks the truck's VIN, Rodriguez, speaking Spanish, asks J. Talamante-Sanchez about his travel, and J. Talamante-Sanchez says that he and his brother stayed with an

aunt in Gallup.  <u>See</u> O. Talamante-Sanchez Motion to Suppress Response at 2; Lapel Camera Footage at 10:45-11:20.

30.    After checking the truck's VIN, Rodriguez returns to his patrol vehicle, and Rodriguez, speaking Spanish, tells O. Talamante-Sanchez to sit inside his patrol vehicle again. <u>See</u> O. Talamante-Sanchez Motion to Suppress Response at 2; Lapel Camera Footage at 11:20-11:25.

31.    O. Talamante-Sanchez gets back inside the patrol vehicle and sits in the passenger seat.  <u>See</u> O. Talamante-Sanchez Motion to Suppress Response at 2; Lapel Camera Footage at 11:25-11:25.

32.    While processing the traffic violation, Rodriguez speaks with O. Talamante-Sanchez, through the translator, about his travel, and O. Talamante-Sanchez repeats that he and his brother spent the week with their sister.  <u>See</u> O. Talamante-Sanchez Motion to Suppress Response at 2; Lapel Camera Footage at 11:30-14:15.

33.    Throughout this second conversation inside the patrol vehicle, O. Talamante-Sanchez is unusually nervous and slow to respond, has trouble providing clear answers, and asks Rodriguez to clarify his questions.  <u>See</u> Lapel Camera Footage at 11:30-14:15; Dash Camera Footage at 11:45-14:30.

34.    After processing the traffic violation, Rodriguez tells O. Talamante-Sanchez, through the translator: "You're free to go."  Lapel Camera Footage at 14:30-14:45.

35.    O. Talamante-Sanchez responds, while exiting the vehicle: "Okay, me bajo?" Lapel Camera Footage at 14:45-14:50.

36.    O. Talamante-Sanchez' response translates to: "Okay, should I get out?" Translation Excerpts at 2:13 (dated June 30, 2025), filed June 30, 2025 (Doc. 55-1)("Translation Excerpts").

37.    Rodriguez does not answer O. Talamante-Sanchez' question, and O. Talamante-Sanchez exits the vehicle.  See Lapel Camera Footage at 14:50-15:00.

38.    After O. Talamante-Sanchez exits the vehicle, Rodriguez says, while waving his hand inward and speaking in a calm and polite manner: "Puedo hablar contigo señor?  Puedo hablar más?"  Lapel Camera Footage at 14:50-14:55.

39.    Rodriguez' question translates to: "Can I speak more with you sir?  Can I talk more?"  Translation Excerpts at 2:14.

40.    From outside the patrol vehicle, O. Talamante-Sanchez nods his head up and down and says: "Uh-huh."  Dash Camera Footage at 15:00-15:10.

41.    Rodriguez continues, in English, while pointing at the passenger seat: "Okay, you can have a seat, and we can talk some more."  Lapel Camera Footage at 14:55-15:00.

42.    O. Talamante-Sanchez sits back down in the passenger seat.  See Lapel Camera Footage at 15:00-15:05.

43.    After O. Talamante-Sanchez sits back down in the passenger seat, the translator says: "Puedes tomar asiento que se, que le va hablar ahi un poquito."  Lapel Camera Footage at 15:00-15:05.

44.    The translator's statement translates to: "You can take a seat, because he's going to talk to you there for a bit."  Translation Excerpts at 2:16.

45.    Through the translator, Rodriguez asks O. Talamante-Sanchez about his work and who owns the truck, and O. Talamante-Sanchez responds nervously.  See Lapel Camera Footage at 15:05-17:40.

46.    Through the translator Rodriguez, asks O. Talamante-Sanchez whether there are firearms, drugs, or large cash amounts in the truck.  See Lapel Camera Footage at 17:40-19:30.

47.    Responding nervously, O. Talamante-Sanchez says that there are no firearms, drugs, or large cash amounts in the truck.  See Lapel Camera Footage at 17:40-19:30.

48.    Rodriguez asks if he can search the truck: "Can I search your truck, and your belongings in the truck?"  Lapel Camera Footage at 19:30-19:35.

49.    The translator translates Rodriguez' question as: "Puedo revisar tu troca y puedo revisar tus pertenencias en la troca?"  Lapel Camera Footage at 19:35-19:45.

50.    The translator's statement translates to: "Can I look through your truck and can I look through your belongings in the truck?"  Translation Excerpts at 2:20.

51.    O. Talamante-Sanchez responds: "Sí. ahí está, ahí está la maleta en el asiento de atrás."  Lapel Camera Footage at a 19:45-19:50.

52.    O. Talamante-Sanchez' response translates to: "Yes, the bag is there, is there in the backseat."  Translation Excerpts at 2:21.

53.    The translator translates O. Talamante-Sanchez' response as: "Yeah, there's bags in the back seat."  Lapel Camera Footage at a 19:50-19:55.

54.    Through the translator, Rodriguez asks O. Talamante-Sanchez more questions about his stay in Gallup, and O. Talamante-Sanchez says that he and his brother slept in the same bedroom while staying at his sister's house.  See Lapel Camera Footage at 19:55-23:20.

55.    At the end of the conversation, Rodriguez tells O. Talamante-Sanchez to stand in front of the truck while Rodriguez speaks more with O. Talamante-Sanchez' brother, J. Talamante-Sanchez.  See Lapel Camera Footage at 19:55-23:20.

56.    O. Talamante-Sanchez exits the vehicle and walks with Rodriguez to the area in the truck's front, where J. Talamante-Sanchez is still standing.  See Lapel Camera Footage at 23:20-23:30.

57.    Speaking Spanish, Rodriguez tells O. Talamante-Sanchez to stand twenty meters in front of the truck.  See Lapel Camera Footage at 23:30-23:40.

58.    Speaking Spanish, Rodriguez asks J. Talamante-Sanchez if he can speak with him. See Lapel Camera Footage at 23:40-23:45.

59.    Speaking Spanish, J. Talamante-Sanchez agrees to speak with Rodriguez.  See Lapel Camera Footage at 23:40-23:45.

60.    Speaking Spanish, Rodriguez orders J. Talamante-Sanchez to follow him to his patrol vehicle and sit in the front passenger seat.  See Lapel Camera Footage at 23:45-23:45.

61.    Through the translator, Rodriguez asks J. Talamante-Sanchez, again, if he can speak with him, and J. Talamante-Sanchez reiterates that he is willing to speak with Rodriguez. See Lapel Camera Footage at 24:00-24:40.

62.    Through the translator, Rodriguez asks J. Talamante-Sanchez questions about his travel, and J. Talamante-Sanchez says that he and his brother stayed at their aunt's house in Gallup, and that he and his brother slept in separate rooms.  See Lapel Camera Footage at 25:00-27:15.

63.    Through the translator, Rodriguez asks J. Talamante-Sanchez if he can search J. Talamante-Sanchez' belongings in the truck.  See Lapel Camera Footage at 28:30-29:50.

64.    J. Talamante-Sanchez gives Rodriguez permission to search his belongings in the truck.  See Lapel Camera Footage at 28:30-29:50.

65.    During the search, Rodriguez and Sanchez remove a dashboard panel and the truck's seats and search suitcases and the spare tire inside the truck.  See Tr. at 74:6-24 (Gorman, Rodriguez).

66.    Rodriguez and Sanchez search the truck for approximately one hour and forty minutes before Jackson arrives at the scene to assist in the search efforts.  See O. Talamante-Sanchez Motion to Suppress Response at 3-4; O. Talamante-Sanchez Motion to Suppress at 3; Lapel Camera Footage at 30:30- 2:11:50; Tr. at 53:25-54:4 (Rodriguez); id. at 75:12-15 (Gorman, Rodriguez).

67.    Before Jackson arrives, Rodriguez and Sanchez do not find any drugs or contraband in the truck.  See Tr. at 74:25-75:11 (Gorman, Rodriguez).

68.    When Jackson arrives, he uses a portable x-ray machine on the truck, and Rodriguez, Sanchez, and Jackson see "bundles," which are "consistent" with narcotics packages, inside the truck's doors.  Tr. at 53:25-54:10 (Rodriguez, Vasquez).

69.    After removing the doors' panels, Rodriguez, Sanchez, and Jackson discover twenty cylindrical packages containing blue pills and one brick-shaped package containing powder.  See O. Talamante-Sanchez Motion to Suppress Response at 4; Tr. at 54:11-55:1 (Vasquez, Rodriguez).

70.    During the search, the Defendants do not ask Rodriguez, Sanchez, or Jackson to stop searching the truck or to limit the search to the Defendants' belongings.  See Lapel Camera Footage at 30:30- 2:11:50; J. Talamante-Sanchez Motion to Suppress Reply at 5.

## PROCEDURAL BACKGROUND

This section outlines this litigation's procedural history.  First, the Court describes the Defendants' indictment.  Second, the Court discusses the suppression briefs.  Third, the Court summarizes the suppression hearing.

### 1.    The Indictment.

On October 8, 2024, a federal Grand Jury indicts the Defendants.  See Indictment at 1-2, filed October 8, 2024 (Doc. 19)("Indictment").  The Indictment sets forth two counts against the Defendants: (i) conspiracy to distribute fentanyl, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A); and (ii) possession with intent to distribute fentanyl, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A)(vi).  See Indictment at 1-2.  The Indictment alleges that both offenses involve 400 grams or more of fentanyl.  See Indictment at 2-3.

### 2.    The Motion to Suppress Briefs.

The Defendants file separate motions to suppress.  See O. Talamante-Sanchez Motion to Suppress at 1; J. Talamante-Sanchez Motion to Suppress at 1.  First, the Court describes the O. Talamante-Sanchez Motion to Suppress, O. Talamante-Sanchez Motion to Suppress Response, and the Defendant Obeth Sanchez' Reply to Government's Response to Opposed Motion to Suppress, filed April 18, 2025 (Doc. 43)("O. Talamante-Sanchez Motion to Suppress Reply").  Next, the Court describes the J. Talamante-Sanchez Motion to Suppress, J. Talamante-Sanchez Motion to Suppress Response, and the J. Talamante-Sanchez Motion to Suppress Reply.

### a.    The O. Talamante-Sanchez Motion to Suppress.

On March 21, 2025, O. Talamante-Sanchez asks the Court to suppress "the fentanyl found in the truck he was driving" on September 9, 2024, based on three alleged Fourth Amendment violations.  O. Talamante-Sanchez Motion to Suppress at 4-10.  First, O. Talamante-Sanchez argues that the traffic stop is unlawful, because Rodriguez does not have reasonable suspicion that

O. Talamante-Sanchez is violating N.M.S.A. § 66-3-805(C).  <u>See</u> O. Talamante-Sanchez Motion to Suppress at 5-8.  To support this argument, O. Talamante-Sanchez points to the Dash Camera Footage, which he says shows that O. Talamante-Sanchez' license plate is clearly legible, as N.M.S.A. § 66-3-805(C) requires, while Rodriguez tails the truck from more than fifty feet away. <u>See</u> O. Talamante-Sanchez Motion to Suppress at 5-8.  Second, O. Talamante-Sanchez argues that Rodriguez extends the traffic stop unlawfully, because, after Rodriguez processes the traffic violation and O. Talamante-Sanchez exits the patrol vehicle, Rodriguez "command[s]" O. Talamante-Sanchez to sit back down and keep speaking with him, even though the "'tasks tied to the traffic infraction'" are complete.  O. Talamante-Sanchez Motion to Suppress at 8 (quoting <u>Rodriguez v. United States</u>, 575 U.S. 348, 354 (2015)).  Third, O. Talamante-Sanchez argues that Rodriguez, Sanchez, and Jackson unlawfully dismantle the truck, because, although "lawful consent search may 'effect some dismantling, and minor damage' it can nonetheless become excessive and exceed the scope of consent."  O. Talamante-Sanchez Motion to Suppress at 9-10 (quoting <u>United States v. Gomez-Arzate</u>, 981 F.3d 832, 845 (10th Cir. 2020)).

> **b.    The O. Talamante-Sanchez Motion to Suppress Response.**

In response, the United States disputes all three of O. Talamante-Sanchez' alleged Constitutional violations.  <u>See</u> O. Talamante-Sanchez Motion to Suppress Response at 6-24.  On the first alleged Constitutional violation, the United States argues that Rodriguez has reasonable suspicion to pull over O. Talamante-Sanchez, because "the license plate affixed to rear bumper was not properly illuminated" in accordance with N.M.S.A. § 66-3-805(C).  O. Talamante-Sanchez Motion to Suppress Response at 6.  On the second alleged Constitutional violation, the United States argues that Rodriguez does not extend the traffic stop unlawfully, because the traffic stop concludes when Rodriguez finishes issuing the written warning to O. Talamante-Sanchez and tells him that he is free to go, and O. Talamante-Sanchez consents voluntarily to additional

- 16 -

questioning when he returns to the patrol vehicle after Rodriguez asks him if they can keep talking. See O. Talamante-Sanchez Motion to Suppress Response at 13-17.  On the third alleged Constitutional violation, the United States argues that Rodriguez, Sanchez, and Jackson do not exceed the scope of O. Talamante-Sanchez' consent to search the truck when the officers scan the truck with a portable x-ray machine and dismantle the truck in search of narcotics, because "[l]aw enforcement officers searching a vehicle are permitted to probe and dismantle parts of the vehicle to access enclosed compartments."  O. Talamante-Sanchez Motion to Suppress Response at 20-21 (citing United States v. Gregoire, 425 F.3d 872, 880-81 (10th Cir. 2005), and United States v. Gomez-Arzate, 981 F.3d at 844-45)).

      c.        **The O. Talamante-Sanchez Motion to Suppress Reply.**

In reply, O. Talamante-Sanchez addresses only the first alleged Constitutional violation and argues that N.M.S.A. § 66-3-805(C) does not require that a trailing vehicle "must be able to see the license at a distance of fifty feet with his headlights off."  O. Talamante-Sanchez Motion to Suppress Reply at 2.  Instead, O. Talamante-Sanchez insists that N.M.S.A. § 66-3-805(C) requires only that: (i) the tail lamp lights are functioning; and (ii) the license plate is clearly visible from fifty feet away, regardless the illumination source.  See O. Talamante-Sanchez Motion to Suppress Reply at 2.  O. Talamante-Sanchez argues that, because the Dash Camera Footage shows that the license plate is legible from Rodriguez' vantage point fifty feet away and the United States does not dispute that the truck's tail lamp lights are functioning, Rodriguez does not have reasonable suspicion to stop O. Talamante-Sanchez, even if Rodriguez' headlights -- rather than O. Talamante-Sanchez' tail lamp lights -- render the license plate visible.  See O. Talamante-Sanchez Motion to Suppress Reply at 2.

**d.    The J. Talamante-Sanchez Motion to Suppress.**

On June 23, 2025, J. Talamante-Sanchez "joins in and adopts all arguments made by his co-defendant, Obeth Talamante-Sanchez" in the O. Talamante-Sanchez Motion to Suppress and provides additional arguments to support the Defendants' suppression requests.  J. Talamante-Sanchez Motion to Suppress at 1.    Regarding the first alleged Constitutional violation, J. Talamante-Sanchez maintains that "the license plate is properly illuminated by the license plate light" and that the "illumination is not from ambient light or a reflection."  J. Talamante-Sanchez Motion to Suppress at 8.  J. Talamante-Sanchez insists, thus, that Rodriguez' mistaken belief that O. Talamante-Sanchez is violating  N.M.S.A. § 66-3-805(C) is not reasonable.  See J. Talamante-Sanchez Motion to Suppress at 6-8.  Asserting that an officer's unreasonable mistake of fact cannot support reasonable suspicion, J. Talamante-Sanchez argues that the initial traffic stop is unlawful. See J. Talamante-Sanchez Motion to Suppress at 6-8.    On the second alleged Constitutional violation, J. Talamante-Sanchez argues that Rodriguez' continued questioning of O. Talamante-Sanchez is unlawful, because: (i) O. Talamante-Sanchez does not consent voluntarily to additional questioning;  and (ii) Rodriguez has not developed reasonable suspicion that O. Talamante-Sanchez is engaged in other criminal activity beyond the predicate traffic violation.    See J. Talamante-Sanchez Motion to Suppress at 8-13.  J. Talamante-Sanchez argues that Rodriguez' additional questioning of O. Talamante-Sanchez is not consensual, because: (i) Rodriguez never tells the Defendants that they did not have to speak with him; (ii) the encounter occurs in the middle of the night on the side of a highway; (iii) O. Talamante-Sanchez is inside the patrol vehicle, isolated from J. Talamante-Sanchez; (iv) the Defendants have been in the United States for only three months and are not aware of their Constitutional rights; and (v) Rodriguez is armed and in full uniform.  See J. Talamante-Sanchez Motion to Suppress at 12-13.  Regarding the third alleged Constitutional violation, J. Talamante-Sanchez argues that the Defendants' purported consent to

search the vehicle and their belongings inside the vehicle is not valid "for all of the same reasons" that Rodriguez' additional questioning of O. Talamante-Sanchez inside the patrol vehicle is not consensual. See J. Talamante-Sanchez Motion to Suppress at 13-14. J. Talamante-Sanchez argues further that, even if the Defendants' consent to search is valid, the search exceeds the consent's scope, because the Defendants limit their consent to a search of their belongings, and do not consent to a search of the entire truck. See J. Talamante-Sanchez Motion to Suppress at 14-15.

**e.    The J. Talamante-Sanchez Motion to Suppress Response.**

In response, the United States, again, disputes all three alleged Constitutional violations. See J. Talamante-Sanchez Motion to Suppress Response at 5-24. In addition to repeating its arguments regarding the license plate issue, the United States argues that J. Talamante-Sanchez' insistence that the Court "distrust law enforcement officers and disregard corroborating evidence" will "carry a steep cost" in suppressing lawfully obtained evidence, and that, when "all of the facts and circumstances in this case are examined without predisposition or prejudice, the evidence shows that the fourteen-year-old pickup truck's dim lights did not adequately illuminate the truck's license plate in accordance with New Mexico law, and Officer Rodriguez had reasonable suspicion to effect the traffic stop." J. Talamante-Sanchez Motion to Suppress Response at 10. On the second alleged Constitutional violation, the United States argues that O. Talamante-Sanchez consents to speak more with Rodriguez after the traffic stop concludes, and that "[a]ll of surrounding facts and circumstances affirm that the co-defendant's will was not overborne and he freely consented to continue to talk with Officer Rodriguez." J. Talamante-Sanchez Motion to Suppress Response at 14. On the third alleged Constitutional violation, the United States first argues that J. Talamante-Sanchez cannot challenge O. Talamante-Sanchez' consent to search the truck, because passengers in a vehicle in which they have neither a property nor possessory interest do not have standing to "mount a Fourth Amendment challenge to a search of the vehicle."

- 19 -

J. Talamante-Sanchez Motion to Suppress Response at 16 (citing <u>Rakas v. Illinois</u>, 439 U.S. 128, 148 (1978); <u>United States v. Jefferson</u>, 925 F.2d 1242, 1249 (10th Cir. 1991); and <u>United States v. Allen</u>, 235 F.3d 482, 489 (10th Cir. 2000)).  The United States argues, further, that O. Talamante-Sanchez consents freely to the full search, because he understands that Rodriguez is asking to search the truck and his belongings in the truck, rather than just O. Talamante-Sanchez' belongings.  <u>See</u> J. Talamante-Sanchez Motion to Suppress at 17-19.

### f.    <u>The J. Talamante-Sanchez Motion to Suppress Reply</u>.

In reply, J. Talamante-Sanchez first maintains that Rodriguez does not have reasonable suspicion to conduct the traffic stop, because the license plate is illuminated properly.  <u>See</u> Defendant Jose Talamante-Sanchez' Reply to the United States' Response to Motion to Suppress Evidence at 2, filed June 30, 2025 (Doc. 55)("J. Talamante-Sanchez Motion to Suppress Reply"). Second, J. Talamante-Sanchez argues that Rodriguez' additional questioning of O. Talamante-Sanchez is not consensual, because: (i) Rodriguez waves his hand inward, toward the car, when he asks O. Talamante-Sanchez if they can keep talking; and (ii) the translator "conveys [Rodriguez'] words to not be permissive but obligatory."   J. Talamante-Sanchez Motion to Suppress Reply at 2-3 (citing Translation Excerpts at 2 and asserting that "the relevant cited passages" provide "the more accurate translation" of Rodriguez' statements).   Regarding the search, J. Talamante-Sanchez first argues that: J. Talamante-Sanchez, a passenger, has standing to challenge the search, because J. Talamante-Sanchez' brother-in-law lent the truck to both Defendants.  <u>See</u> J. Talamante-Sanchez Motion to Suppress Reply at 3-4.  Second, J. Talamante-Sanchez argues that O. Talamante-Sanchez' purported consent to search the truck is not valid, because the translator does not translate Rodriguez' question clearly.  <u>See</u> J. Talamante-Sanchez Motion to Suppress Reply at 4-5.  According to J. Talamante-Sanchez, although Rodriguez asks to search "your truck, and your belongings," the translator's says the word, "y" -- which translates

to "and" -- very quickly.  J. Talamante-Sanchez Motion to Suppress Reply at 4 (citing Translation Excerpts at 2 and asserting that the translator "had to use her translation equipment to slow down the speech significantly to hear this 'y'").  To buttress this argument, J. Talamante-Sanchez notes that O. Talamante-Sanchez "responds in a manner indicating he was only referencing permission to search his belongings," because, in his initial response, he tells Rodriguez where his bags are. J. Talamante-Sanchez Motion to Suppress Reply at 4-5.

### 3.    **The Suppression Hearing**.

On July 1, 2025, the Court holds an evidentiary suppression hearing.  <u>See</u> Minutes at 1. First, the Defendants decline to make any opening statements and opt, instead, to rest on briefs. <u>See</u> Tr. at 6:17-20 (Glanz, Court, Gorman).  When the Court asks if there is any "daylight" between the Defendants on the suppression issues, J. Talamante-Sanchez asserts that, other than his "focus on the translation service" and standing arguments, the Defendants' arguments are in harmony. Tr. at 9:1-24 (Gorman).   Next, the United States calls Rodriguez as a witness, the Defendants cross-examine him, and the United States conducts re-direct.  <u>See</u> Minutes at 2.

### <u>LAW REGARDING FOURTH AMENDMENT SEARCHES</u>

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV. It also commands that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  U.S. Const. amend. IV.   In determining whether a Fourth Amendment violation has occurred, courts must "assur[e] preservation of that degree of privacy against government that existed when the Fourth Amendment was adopted."  <u>United States v. Jones</u>, 565 U.S. 400, 406 (2012)(Scalia, J.)(quoting <u>Kyllo v. United States</u>, 533 U.S. 27, 31 (2001)(Scalia, J.))(brackets in <u>United States v. Jones</u>, but not in <u>Kyllo v. United States</u>).

"Not all searches require a warrant. The hallmark of the Fourth Amendment is reasonableness." United States v. Harmon, 785 F. Supp. 2d 1146, 1157 (D.N.M. 2011)(Browning, J.). See United States v. McHugh, 639 F.3d 1250, 1260 (10th Cir. 2011)("[T]he ultimate touchstone of the Fourth Amendment is 'reasonableness.'")(quoting Brigham City, Utah v. Stuart, 547 U.S. 398, 403 (2006)). "In the criminal context, reasonableness usually requires a showing of probable cause." Herrera v. Santa Fe Pub. Sch., 792 F. Supp. 2d 1174, 1184 (D.N.M. 2011)(Browning, J.)(quoting Bd. of Educ. of Indep. Sch. Dist. No. 92 of Pottawatomie Cty. v. Earls, 536 U.S. 822, 828 (2002)). The Supreme Court of the United States holds that, in the law enforcement context, "searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment -- subject only to a few specifically established and well-delineated exceptions." Katz v. United States, 389 U.S. 347, 357 (1967)(footnotes omitted). See United States v. Knapp, 917 F.3d 1161, 1165 (10th Cir. 2019)("The warrantless search rule, however, is subject to several exceptions.").

### 1.    **Reasonable Government Searches**.

"[B]ecause 'the ultimate touchstone of the Fourth Amendment is reasonableness,'" when a search implicating the Fourth Amendment has occurred, the district court must determine whether the search is reasonable. Kentucky v. King, 563 U.S. 452, 459 (2011)(quoting Brigham City v. Stuart, 547 U.S. at 403. See Samson v. California, 547 U.S. 843, 848 (2006)("'[U]nder our general Fourth Amendment approach' we 'examin[e] the totality of the circumstances' to determine whether a search is reasonable within the meaning of the Fourth Amendment." (quoting United States v. Knights, 534 U.S. 112, 118 (2001))). "Although the Fourth Amendment ordinarily requires the degree of probability embodied in the term 'probable cause,' a lesser degree satisfies the Constitution when the balance of governmental and private interests makes such a standard reasonable." United States v. Knights, 534 U.S. at 121. The Supreme Court justifies this

balancing test with the recognition that "[t]he Fourth Amendment does not protect all subjective expectations of privacy, but only those that society recognizes as 'legitimate.'"  Vernonia Sch. Dist. 47J v. Acton, 515 U.S. 646, 654 (1995)(quoting New Jersey v. T.L.O., 649 U.S. 325, 338 (1985)).

"Whether a search is reasonable 'is determined by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests.'"  Samson v. California, 547 U.S. at 848 (quoting United States v. Knights, 534 U.S. at 118).  See Banks v. United States, 490 F.3d 1178, 1184 (10th Cir. 2007)(stating that the Supreme Court "described the totality-of-the-circumstances test as one where 'the reasonableness of a search is determined by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy, and on the other, the degree to which it is needed for the promotion of legitimate governmental interests'" (quoting United States v. Knights, 534 U.S. at 119-20)).

> As the text of the Fourth Amendment indicates, the ultimate measure of the constitutionality of a governmental search is "reasonableness."  At least in a case . . . where there was no clear practice, either approving or disapproving the type of search at issue, at the time the constitutional provision was enacted, whether a particular search meets the reasonableness standard "'is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests.'"

Vernonia Sch. Dist. 47J v. Acton, 515 U.S. at 652-53 (quoting Skinner v. Ry. Labor Executives' Ass'n, 489 U.S. 602, 617 (1989)).  The Supreme Court has held that the test of reasonableness under the Fourth Amendment is not a concrete test:

> The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application.  In each case [determining reasonableness] requires a balancing of the need for the particular search against the invasion of personal rights that the search entails.  Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted.

Bell v. Wolfish, 441 U.S. 520, 559 (1979).

In analyzing the first factor -- the intrusion on the individual's privacy -- courts look to the individual's privacy expectations.  See, e.g., United States v. Knights, 534 U.S. at 119-120 (noting that the petitioner had a "significantly diminished . . . reasonable expectation of privacy," because a condition of his probation was to consent to search of his apartment without notice or probable cause, and because he clearly was notified and informed of the provision); Banks v. United States, 490 F.3d at 1186-87 (noting that the plaintiffs, convicted felons on probation, have a more limited expectation of privacy than the ordinary citizen, and noting that "'[w]hat is "reasonable" under the fourth amendment for a person on conditional release, or a felon, may be unreasonable for the general population'")(quoting Green v. Berge, 354 F.3d 675, 680 (7th Cir. 2004)(Easterbrook, J., concurring))(internal quotations have no citation); Boling v. Romer, 101 F.3d 1336, 1340 (10th Cir. 1999)("[W]hile obtaining and analyzing the DNA or saliva of an inmate convicted of a sex offense is a search and seizure implicating Fourth Amendment concerns, it is a reasonable search and seizure.  This is so in light of an inmate's diminished privacy rights . . . .").

As the Honorable Elena Kagan, Associate Justice of the Supreme Court, notes, property law informs society's expectations about what government intrusions are reasonable: "It is not surprising that in a case involving a search of a home, property concepts and privacy concepts should so align.  The law of property 'naturally enough influence[s]' our 'shared social expectations' of what places should be free from governmental incursions."  Florida v. Jardines, 569 U.S. 1, 13 (2013)("Jardines")(Kagan, J., concurring)(quoting Georgia v. Randolph, 547 U.S. 103, 111 (2006))(alteration in Jardines, but not in Georgia v. Randolph).  Similarly, in Vernonia Sch. Dist. 47J v. Acton, Justice Scalia, writing for the majority, notes: "What expectations are legitimate varies, of course, with context . . . , depending, for example, upon whether the

individual asserting the privacy interest is at home, at work, in a car, or in a public park." 515 U.S. at 654 (citing New Jersey v. T.L.O., 469 U.S. 325, 337 (1985)).

      **2.**      **Florida v. Jardines.**

      In Florida v. Jardines, Justice Scalia holds that using a drug-sniffing dog to sniff a person's "home and its immediate surroundings" is a Fourth Amendment search. 569 U.S. at 11. Justices Thomas, Ginsburg, Sotomayor, and Kagan join Justice Scalia's majority opinion in Florida v. Jardines. Justice Kagan files a separate concurring opinion, in which Justices Ginsburg and Sotomayor join, adding "further thoughts, suggesting that a focus on Jardines' privacy interests would make 'an easy cas[e] easy' twice over," but "join[ing] the Court's opinion in full." 569 U.S. at 16 (Kagan, J., concurring). Justice Alito dissents, and Chief Justice Roberts, Justice Kennedy, and Justice Breyer join his opinion.

      In Florida v. Jardines, the Miami-Dade, Florida, police department and the Drug Enforcement Administration receive a tip that the defendant Jardines is growing marijuana in his home, and then send a surveillance team to Jardines' home. See 569 U.S. at 3. Observing nothing of note in the first fifteen minutes watching the home, two detectives approach the home accompanied by a dog trained to detect marijuana, cocaine, heroin, and several other drugs by alerting the detectives with behavioral changes. See Jardines, 569 U.S. at 3. As the dog approaches Jardines' front porch, the dog "apparently sensed one of the odors he had been trained to detect," and after tracking back and forth, sat at the base of the front door, "which is the trained behavior upon discovering the odor's strongest point." 569 U.S. at 3. The dog's handler then immediately leaves the porch, and tells the other agents and officers at the scene that there is a positive alert for drugs, at which time the officers apply for and receive a search warrant for the residence, the

execution of which reveals marijuana plants.  See 569 U.S. at 3.  Jardines is arrested for trafficking

in marijuana and moves to suppress the evidence based on an illegal search. See 569 U.S. at 3.

Justice Scalia holds that the use of a drug-sniffing dog is a Fourth Amendment search, reasoning:

> [T]his case [is] a straightforward one.  The officers were gathering information in
> an area belonging to Jardines and immediately surrounding his house -- in the
> curtilage of the house, which we have held enjoys protection as part of the home
> itself. And they gathered that information by physically entering and occupying the
> area to engage in conduct not explicitly or implicitly permitted by the homeowner.

569 U.S. at 5.  Justice Scalia notes that "[t]he Fourth Amendment 'indicates with some precision

the places and things encompassed by its protections': persons, houses, papers, and effects."  569

U.S. at 6 (quoting Oliver v. United States, 466 U.S. at 176).  Thus, the Fourth Amendment does

not cover every "investigation[] on private property; for example, an officer may (subject to Katz)

gather information in what we have called 'open fields' -- even if those fields are privately owned

-- because such fields are not enumerated in the Amendment's text."  569 U.S. at 6.

Justice Scalia holds that "the officers' investigation took place in a constitutionally

protected area," the home, because the front porch is the home's curtilage.  Jardines, 569 U.S. at

7.  Justice Scalia then "turn[s] to the question of whether it was accomplished through an

unlicensed physical intrusion," 569 U.S. at 5, and reasons:

> While law enforcement officers need not "shield their eyes" when passing by the
> home "on public thoroughfares," [California v. ]Ciraolo, 476 U.S. [207,] 213
> [(1986)], an officer's leave to gather information is sharply circumscribed when he
> steps off those thoroughfares and enters the Fourth Amendment's protected areas.
> In permitting, for example, visual observation of the home from "public navigable
> airspace," we were careful to note that it was done "in a physically nonintrusive
> manner."  Id.  Entick v. Carrington, 2 Wils. K.B. 275, 95 Eng. Rep. 807 (K.B.
> 1765), a case "undoubtedly familiar" to "every American statesman" at the time of
> the Founding, Boyd v. United States, 116 U.S. 616, 626 . . . (1886)[, abrogated by
> Warden, Md. Penitentiary v. Hayden, 387 U.S. 294 (1967)], states the general rule
> clearly: "[O]ur law holds the property of every man so sacred, that no man can set
> his foot upon his neighbour's close without his leave." 2 Wils. K.B., at 291.  As it
> is undisputed that the detectives had all four of their feet and all four of their
> companion's firmly planted on the constitutionally protected extension of Jardines'

home, the only question is whether he had given his leave (even implicitly) for them
to do so.  He had not.

Jardines, 569 U.S. at 7-8.  Justice Scalia notes that, while society recognizes an implicit license

which "typically permits the visitor to approach the home by the front path, knock promptly, wait

briefly to be received, and then (absent invitation to linger longer) leave," he concludes that

"introducing a trained police dog to explore the area around the home in hopes of discovering

incriminating evidence is something else.  There is no customary invitation to do that."  Jardines,

569 U.S. at 9 (emphasis in original).  Justice Scalia explains:

> An invitation to engage in canine forensic investigation assuredly does not inhere
> in the very act of hanging a knocker. To find a visitor knocking on the door is
> routine (even if sometimes unwelcome); to spot that same visitor exploring the front
> path with a metal detector, or marching his bloodhound into the garden before
> saying hello and asking permission, would inspire most of us to -- well, call the
> police.  The scope of a license -- express or implied -- is limited not only to a
> particular area but also to a specific purpose. Consent at a traffic stop to an officer's
> checking out an anonymous tip that there is a body in the trunk does not permit the
> officer to rummage through the trunk for narcotics. Here, the background social
> norms that invite a visitor to the front door do not invite him there to conduct a
> search.

Jardines, 569 U.S. at 3.

Justice Scalia further notes that, in United States v. Jones, the Supreme Court concludes

that "[t]he Katz reasonable-expectations test 'has been added to, not substituted for,' the traditional

property-based understanding of the Fourth Amendment, and so it is unnecessary to consider [the

test under Katz v. United States] when the government gains evidence by physically intruding on

constitutionally protected areas."  Jardines, 569 U.S. at 11 (quoting United States v. Jones, 565

U.S. at 409).  Because the Supreme Court concludes that the conduct is a Fourth Amendment

search under the trespass-based analysis, therefore, it holds that it is unnecessary to consider

whether the conduct amounts to a search under the Katz v. United States reasonable-expectation-

of-privacy analysis:

Thus, we need not decide whether the officers' investigation of Jardines' home violated his expectation of privacy under Katz. One virtue of the Fourth Amendment's property-rights baseline is that it keeps easy cases easy. That the officers learned what they learned only by physically intruding on Jardines' property to gather evidence is enough to establish that a search occurred.

Jardines, 569 U.S. at 11.

**3.    Vehicle Searches.**

One exception to the Fourth Amendment search-warrant requirement is the automobile exception, which allows law enforcement to search a vehicle without a warrant if they have probable cause to believe the vehicle contains evidence of criminal activity. See Collins v. Virginia, 584 U.S. 586, 591-92 (2018). While an automobile stop may be made based on reasonable suspicion that the driver has committed a crime, see United States v. Toro-Pelaez, 107 F.3d at 823-24, an officer must have probable cause to believe that the vehicle contains contraband or other evidence of criminality to execute an automobile search, see United States v. Forbes, 528 F.3d 1273, 1277-78 (10th Cir. 2008)("[T]he Fourth Amendment unquestionably prohibits the search of a vehicle's interior unless law enforcement officials receive consent, have a warrant, or otherwise establish probable cause to support the search."). Under the automobile-exception to the warrant requirement, however, a warrant generally is not required. See Carroll v. United States, 267 U.S. 132, 153 (1925)(establishing the automobile exception for vehicles, "because the vehicle can be quickly moved out of the locality or jurisdiction in which the warrant must be sought" unlike "a store, dwelling house, or other structure"). The ongoing exigent circumstance that the vehicle might drive away has led the Supreme Court to conclude that a warrant is not required to search a vehicle. See Collins v. Virginia, 584 U.S. at 596 (declining to apply the automobile exception to a motorcycle parked in the curtilage of a house, because such a search "would unmoor the exception from its justification" that a vehicle poses a risk of immediate mobility); Maryland v. Dyson, 527 U.S. 465, 467 (1999)("[W]here there [is] probable cause to search a vehicle[,] 'a

search is not unreasonable if based on facts that would justify the issuance of a warrant, even though a warrant has not been actually obtained.'")(quoting United States v. Ross, 456 U.S. at 809)(emphasis added in Maryland v. Dyson); California v. Carney, 471 U.S. 386, 393 (1985)(applying the automobile exception to the defendant's mobile home, because it was "readily mobile" and "could readily have been moved beyond the reach of the police").

Thus, if the vehicle is readily mobile, "'probable cause to search a vehicle is established if, under the totality of the circumstances, there is a fair probability that the car contains contraband or evidence.'" United States v. Phillips, 71 F.4th 817, 823 (10th Cir. 2023)(quoting United States v. Vasquez-Castillo, 258 F.3d 1207, 1212 (10th Cir. 2001)). The search's object and the places in which there is probable cause to believe that the object may be found define the scope of a warrantless vehicle search. See United States v. Ross, 456 U.S. 798, 824 (1982). Accordingly, if probable cause justifies a vehicle search, it justifies the search of every part of the vehicle in which the evidence might be found, including closed compartments, containers, packages, and trunks, and any contents or containers that may conceal the object of the search. See California v. Acevedo, 500 U.S. 565, 574 (1991); Wyoming v. Houghton, 526 U.S. 295, 304-07 (1999); United States v. Rosborough, 366 F.3d 1145, 1152-53 (10th Cir. 2004).

### 4.    Searches Incident to Arrest.

"Among the exceptions to the warrant requirement is a search incident to a lawful arrest." Arizona v. Gant, 556 U.S. 332, 338 (2009)("Gant"). The exception "derives from interests in officer safety and evidence preservation that are typically implicated in arrest situations." Gant, 556 U.S. at 338. The search-incident-to-lawful-arrest exception enables the search "of the arrestee's person" in addition to "the area within the arrestee's 'immediate control.'" United States v. Knapp, 917 F.3d at 1165 (quoting Chimel v. California, 395 U.S. 752, 763 (1969)). The

Supreme Court defines the area within the arrestee's "immediate control" as "the area from within which he might gain possession of a weapon or destructible evidence," Chimel v. California, 395 U.S. at 763, a limitation that "ensures that the scope of a search incident to arrest is commensurate with its purposes of protecting arresting officers and safeguarding any evidence of the offense of arrest that an arrestee might conceal or destroy," Gant, 556 U.S. at 339.

The search-incident-to-lawful-arrest exception also may enable a search of an automobile where a recent occupant is placed under arrest. See New York v. Belton, 453 U.S. 454, 459-60 (1981). An automobile search incident to a recent occupant's arrest is Constitutional if: (i) "the arrestee is within reaching distance of the vehicle during the search"; or (ii) "if the police have reason to believe that the vehicle contains 'evidence relevant to the crime of arrest.'" Davis v. United States, 564 U.S. 229, 235 (2011)(quoting Gant, 556 U.S. at 343). See United States v. Knapp, 917 F.3d at 1168 (explaining that automobile searches incident to a lawful arrest under Gant "are justified either by the 'twin rationales of Chimel' or by an arresting officer's reasonable belief that the vehicle contains evidence of the crime precipitating the arrest" (quoting Gant, 556 U.S. at 342-43)). Although a search incident to arrest must be a "contemporaneous incident of [a lawful] arrest," New York v. Belton, 453 U.S. at 460, it is of no moment that a search precedes an arrest, so long as "probable cause for the arrest precede[s] the search," United States v. Smith, 389 F.3d 944, 952-53 (9th Cir. 2004).

### 5. Fourth Amendment Standing.

The Tenth Circuit refers to the test whether a particular search implicates a defendant's Fourth Amendment interests -- whether the search violates the defendant's reasonable privacy expectation -- as one of "standing." United States v. Creighton, 639 F.3d 1281, 1286 (10th Cir. 2011)("The Defendant has the burden of establishing . . . standing, or, in other words, a subjective expectation of privacy in the [item searched] that society is prepared to recognize as reasonable.");

United States v. Poe, 556 F.3d 1113, 1121 (10th Cir. 2009)("[A] defendant raising a Fourth Amendment challenge must first demonstrate that he has standing to object to the search.")(citing United States v. Rubio-Rivera, 917 F.2d 1271, 1274 (10th Cir. 1990)); United States v. Shareef, 100 F.3d 1491, 1499 (10th Cir. 1996)("A Defendant has standing to challenge a search only if he or she has a reasonable expectation of privacy in the area being searched."). Accordingly, the Court, tracing the Tenth Circuit's language, refers to this test as one of standing. See, e.g., United States v. Harmon, 785 F. Supp. 2d at 1157 ("Standing requires the defendant to show 'that he had a subjective expectation of privacy in the premises searched and that society is prepared to recognize that expectation as reasonable.'")(quoting United States v. Poe, 556 F.3d at 1121).  The Supreme Court's decisions in United States v. Jones and Florida v. Jardines, however, suggest that this test now expressly has been designated a substantive Fourth Amendment analysis alongside the trespass-based Fourth Amendment analysis rather than a distinct analysis under the rubric entitled standing.

In Rakas v. Illinois, 439 U.S. 128 (1978), the Supreme Court disapproves of labeling the inquiry whether a search implicates a defendant's personal Fourth Amendment interests "as one of standing, rather than simply recognizing it as one involving the substantive question of whether or not the proponent of the motion to suppress had his own Fourth Amendment rights infringed by the search and seizure which he seeks to challenge."  439 U.S. at 133.  Dispensing with this label, the Supreme Court notes:

> Had we accepted petitioners' request to allow persons other than those whose own Fourth Amendment rights were violated by a challenged search and seizure to suppress evidence obtained in the course of such police activity, it would be appropriate to retain Jones[ v. United States, 362 U.S. 257 (1960, overruled by United States v. Salvucci, 448 U.S. 83 (1980)]' use of standing in Fourth Amendment analysis.  Under petitioners' target theory, a court could determine that a defendant had standing to invoke the exclusionary rule without having to inquire into the substantive question of whether the challenged search or seizure violated

the Fourth Amendment rights of that particular defendant. However, having rejected petitioners' target theory and reaffirmed the principle that the "rights assured by the Fourth Amendment are personal rights, [which] . . . may be enforced by exclusion of evidence only at the instance of one whose own protection was infringed by the search and seizure," Simmons v. United States, 390 U.S. at 389 . . . , the question necessarily arises whether it serves any useful analytical purpose to consider this principle a matter of standing, distinct from the merits of a defendant's Fourth Amendment claim. We can think of no decided cases of this Court that would have come out differently had we concluded, as we do now, that the type of standing requirement discussed in Jones and reaffirmed today is more properly subsumed under substantive Fourth Amendment doctrine. Rigorous application of the principle that the rights secured by this Amendment are personal, in place of a notion of "standing," will produce no additional situations in which evidence must be excluded. The inquiry under either approach is the same. But we think the better analysis forthrightly focuses on the extent of a particular defendant's rights under the Fourth Amendment, rather than on any theoretically separate, but invariably intertwined concept of standing. The Court in Jones also may have been aware that there was a certain artificiality in analyzing this question in terms of standing because in at least three separate places in its opinion the Court placed that term within quotation marks. 362 U.S., at 261, 263, 265 . . . .

Rakas v. Illinois, 439 U.S. at 138-39. The Supreme Court emphasizes:

> [N]othing we say here casts the least doubt on cases which recognize . . . as a general proposition, the issue of standing [generally.] . . . But this Court's long history of insistence that Fourth Amendment rights are personal in nature has already answered many of these traditional standing inquiries, and we think that definition of those rights is more properly placed within the purview of substantive Fourth Amendment law than within the purview of substantive Fourth Amendment law than within that of standing.

Rakas v. Illinois, 439 U.S. at 139-40. In Minnesota v. Carter, the Supreme Court recognizes that

Rakas v. Illinois put an end to the Fourth Amendment standing analysis as separate from the

substantive Fourth Amendment search analysis:

> The Minnesota courts analyzed whether respondents had a legitimate expectation of privacy under the rubric of "standing" doctrine, an analysis that this Court expressly rejected 20 years ago in Rakas . . . . Central to our analysis [in Rakas v. Illinois] was the idea that in determining whether a defendant is able to show the violation of his (and not someone else's) Fourth Amendment rights, the "definition of those rights is more properly placed within the purview of substantive Fourth Amendment law than within that of standing." Id., at 140 . . . .

Minnesota v. Carter, 525 U.S. at 87-88.  The Supreme Court notes that the analysis under either approach -- the substantive Fourth Amendment doctrine that the rights that the Amendment secures are personal versus the separate notion of "standing" -- is the same and that Katz v. United States' reasonable-expectation-of-privacy analysis now is a substantive Fourth Amendment test, as opposed to a standing test.  See Rakas v. Illinois, 439 U.S. at 139.

      **6.**      **Probation Searches.**

Although law enforcement officers typically must obtain a search warrant which probable cause supports before conducting a search, there are exceptions to this requirement where "'special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable.'"  United States v. Carter, 511 F.3d 1264, 1267 (10th Cir. 2008)(quoting Griffin v. Wisconsin. 483 U.S. 868, 873 (1987)).  The Supreme Court concludes that, in the State probation context, special needs negate the requirement that an officer obtain a warrant supported by probable cause.  See United States v. Carter, 511 F.3d at 1268 (citing Griffin v. Wisconsin, 483 U.S. at 875).  See, e.g., United States v. Romo, No. CR 14-2352, 2015 WL 13651108, at *4 (D.N.M. December 2, 2015)(Armijo, C.J.)(unpublished)(stating that New Mexico's State probation system presents a "special need" under Griffin v. Wisconsin).  For a probation search to meet the Fourth Amendment's requirements, it must be "'carried . . . out pursuant to state law which itself satisfies the Fourth Amendment's reasonableness requirement.'"  United States v. Carter, 511 F.3d at 1268 (quoting United States v. Lewis, 71 F.3d 358, 361 (10th Cir. 1995)).

In United States v. Knights, 534 U.S. 112 (2001), the Supreme Court concludes that a probationer who signs a probation agreement that "clearly expressed the search condition" has a "significantly diminished . . . reasonable expectation of privacy."  534 U.S. at 119-20.  See United States v. Blake, 284 F. App'x 530, 535-536 (10th Cir. 2008)("The Supreme Court has concluded

that 'probationers and parolees do not enjoy the full suite of rights provided by the Fourth Amendment.'" (citing United States v. Trujillo, 404 F.3d 128, 1241-42 (10th Cir. 2005)(discussing Griffin v. Wisconsin, 483 U.S. 868 (1987), and United States v. Knights, 534 U.S. 112 (2001))). In so concluding, the Supreme Court states that, "[j]ust as other punishments for criminal convictions curtail an offender's freedoms, a court granting probation may impose reasonable conditions that deprive the offender of some freedoms enjoyed by law-abiding citizens." United States v. Knights, 534 U.S. at 119.  The Tenth Circuit "has interpreted *Knights* to mean that 'a probation search [is] permissible so long as supported by reasonable suspicion, regardless of the motivation for the search.'" United States v. Freeman, 479 F.3d 743, 747 (10th Cir. 2007)(quoting United States v. Tucker, 305 F.3d 1193, 1200 (10th Cir. 2002)(alteration in United States v. Freeman, but not United States v. Tucker)).

Reasonable suspicion is "['] merely a particularized and objective basis for suspecting criminal activity.'" United States v. Freeman, 479 F.3d at 748 (quoting United States v. Tucker, 305 F.3d at 1200).  While reasonable suspicion requires "'some minimal level of objective justification,'" it requires less justification than is required to show probable cause. United States v. Freeman, 479 F.3d at 749-50 (quoting INS v. Delgado, 466 U.S. 210, 217 (1984), and citing United States v. Sokolow, 490 U.S. 1, 7 (1989)). In assessing whether reasonable suspicion exists for a search, courts "consider the quantity and reliability of the information possessed by law enforcement and consider this information in light of the totality of the circumstances." United States v. Freeman, 479 F.3d at 749 (citing United States v. Sokolow, 490 U.S. at 8).

In a number of instances and in a variety of contexts, the Tenth Circuit has upheld probation searches when the officer conducting the search has reasonable suspicion to conduct the search pursuant to a probation agreement's terms.  In United States v. Blake, the Tenth Circuit refuses to

suppress evidence found during a search pursuant to the defendant's wife's probation agreement of a residence that the defendant shared with his wife.  See 284 F. App'x at 535-37.  In United States v. Stewart, 273 F. App'x 768 (10th Cir. 2008), the Tenth Circuit declines to suppress evidence found during the search of a defendant's residence, pursuant to the defendant's probation agreement, that police and probation agents conduct while attempting to execute an arrest warrant. See 273 F. App'x at 769-71.  In United States v. Carter, the Tenth Circuit declined to suppress evidence found during the search of a defendant's residence on the basis of a tip which a social worker relayed to the defendant's probation officer that the defendant was in breach of his probation agreement, and also declined to suppress evidence found during a subsequent consensual search.  See 511 F.3d 1266-69.

       **7.**       **Probable Cause for Search Warrants.**

"The Supreme Court requires that a magistrate judge be provided information sufficient to determine the existence of probable cause before he or she issues a warrant."  United States v. Romero, 743 F. Supp. 2d 1281, 1302 (D.N.M. 2010)(Browning, J.)(citing Illinois v. Gates, 462 U.S. 213, 239 (1983)), aff'd, 749 F.3d 900 (10th Cir. 2014).  Probable cause requires "more than mere suspicion but less evidence than is necessary to convict."  United States v. Burns, 624 F.2d 95, 99 (10th Cir. 1980).  To establish probable cause to justify a search of a home, an affidavit in support of a search warrant "must contain facts sufficient to lead a prudent person to believe that a search would uncover contraband or evidence of criminal activity."  United States v. Danhauer, 229 F.3d 1002, 1006 (10th Cir. 2000).  "Probable cause undoubtedly requires a nexus between suspected criminal activity and the place to be searched."  United States v. Corral-Corral, 899 F.2d 927, 937 (10th Cir. 1990).

> The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay

> information, there is a fair probability that contraband or evidence of a crime will
> be found in a particular place.

Illinois v. Gates, 462 U.S. at 238 (internal quotations have no citation).  See United States v. Glover, 104 F.3d 1570, 1578 (10th Cir. 1997)(concluding that, in determining whether an affidavit supports a finding of probable cause, the court must review the affidavit as a whole and look to the totality of the information contained therein), abrogated on other grounds by Corley v. United States, 556 U.S. 303 (2009).  In making his or her determination, the magistrate judge "may draw reasonable inferences from the material provided in the warrant application."  United States v. Rowland, 145 F.3d 1194, 1205 (10th Cir. 1998).

"Reviewing courts should give the magistrate's ultimate probable cause decision 'great deference.'"  United States v. Rowland, 145 F.3d at 1204 (quoting United States v. Cusumano, 83 F.3d 1247, 1250 (10th Cir. 1996)).  The Court's duty is "simply to ensure that the magistrate had a 'substantial basis for . . . conclud[ing]' that probable cause existed."  Illinois v. Gates, 462 U.S. at 238-39 (quoting Jones v. United States, 362 U.S. at 271)(ellipses and brackets in Illinois v. Gates, but not in Jones v. United States).  This deference is appropriate to further the Fourth Amendment's strong preference for warrants.  See Massachusetts v. Upton, 466 U.S. 727, 733 (1984); Aguilar v. Texas, 378 U.S. 108, 110-11 (1964)("An evaluation of the constitutionality of a search warrant should begin with the rule 'that the informed and deliberate determinations of magistrates empowered to issue warrants . . . are to be preferred over the hurried action of officers . . . .'" (quoting United States v. Lefkowitz, 285 U.S. 452, 464 (1932)), abrogated on other grounds by Illinois v. Gates, 462 U.S. 213.  Because of the strong preference for warrants, "in a doubtful or marginal case a search under a warrant may be sustainable where without one it would fall."  United States v. Ventresca, 380 U.S. 102, 106 (1965).

"The deference accorded a magistrate judge's probable cause determination, however, is not boundless." United States v. Alabi, 943 F. Supp. 2d 1201, 1253-54 (D.N.M. 2013)(Browning, J.), aff'd, 597 F. App'x 991 (10th Cir. 2015)(unpublished). "The court should not defer to a magistrate judge's probable-cause determination where there is no substantial basis for concluding that the affidavit in support of the warrant established probable cause." United States v. Sedillo, 297 F. Supp. 3d 1155, 1180 (D.N.M. 2017)(Browning, J.)(citing United States v. Danhauer, 229 F.3d at 1006). Specifically, the Court should not defer to a magistrate judge's "probable cause determination if it is a mere ratification of the bare conclusions or 'hunches' of others or where it involves an improper analysis of the totality of the circumstances." United States v. Reed, 195 F. App'x 815, 822 (10th Cir. 2006)(citing United States v. Leon, 468 U.S. at 915; Massachusetts v. Upton, 466 U.S. at 734; Illinois v. Gates, 462 U.S. at 239).

## 8.    Specificity Required in Warrants.

In several opinions, the Tenth Circuit has clearly established that items to be seized must be described within the search warrant for seizure of those items to be reasonable. The Fourth Amendment requires search warrants to particularly describe the place to be searched, and the persons or things to be seized. See United States v. Angelos, 433 F.3d 738, 744 (10th Cir. 2006). Furthermore, the Tenth Circuit has held that "[t]he Fourth Amendment requires that a search warrant describe the things to be seized with sufficient particularity to prevent a general exploratory rummaging in a person's belongings." United States v.. Campos, 221 F.3d 1143, 1147 (10th Cir. 2000)(quoting United States v. Carey, 172 F.3d 1268, 1271 (10th Cir. 1999). "A warrant's description of things to be seized is sufficiently particular if it allows the searcher to reasonably ascertain and identify the things authorized to be seized." United States v. Hargus, 128 F.3d 1358, 1362 (10th Cir. 1997). "The requirement that warrants shall particularly describe the things to be seized makes general searches under them impossible and prevents the seizure of one

thing under a warrant describing another.  As to what is to be taken, nothing is left to the discretion of the officer executing the warrant."  <u>Davis v. Gracey</u>, 111 F.3d 1472, 1478 (10th Cir. 1997)(quoting <u>Marron v. United States</u>, 175 U.S. 192, 196 (1927)).  "The test applied to the description of the items to be seized is a practical one . . . and the language in warrants is to be read in a common sense fashion . . . As an irreducible minimum, a proper warrant must allow the executing officers to distinguish between items that may and may not be seized." <u>Davis v. Gracey</u>, 111 F.3d at 1478.  <u>See</u> <u>Copar Pumice Co. v. Morris</u>, No. CIV 07-79 JB/ACT, 2008 WL 2323488, at *11-12 (D.N.M. Mar. 21, 2008)(Browning, J.)

## LAW REGARDING FOURTH AMENDMENT SEIZURES

The Fourth Amendment protects individuals from unreasonable seizures.  <u>See</u> U.S. Const. amend. IV.  "A person is seized by the police and thus entitled to challenge the government's action under the Fourth Amendment when the officer, 'by means of physical force or show of authority,' terminates or restrains his freedom of movement."  <u>Brendlin v. California</u>, 551 U.S. 249, 254 (2007)(quoting <u>Florida v. Bostick</u>, 501 U.S. 429, 434 (1991)).  <u>See</u> <u>United States v. Roberson</u>, 864 F.3d 1118, 1121 (10th Cir. 2017).  "[W]hen an officer does not apply physical force to restrain a subject, a Fourth Amendment seizure occurs only if (a) the officer shows his authority; and (b) the citizen 'submits to the assertion of authority.'"  <u>United States v. Salazar</u>, 609 F.3d at 1064 (quoting <u>California v. Hodari D.</u>, 499 U.S. 621, 626 (1991)).  "'[T]he test for existence of a show of authority is an objective one: not whether the citizen perceived that he was being ordered to restrict his movement, but whether the officer's words and actions would have conveyed that to a reasonable person.'"  <u>United States v. Salazar</u>, 609 F.3d at 1064 (quoting <u>California v. Hodari D.</u>, 499 U.S. at 628).  "'If a reasonable person would feel free to terminate the encounter, then he or she has not been seized.'"  <u>United States v. Ojeda-Ramos</u>, 455 F.3d 1178, 1183 (10th Cir. 2006)(quoting

United States v. Drayton, 536 U.S. 194, 201 (2002)).  See California v. Hodari D., 499 U.S. at 627-28 ("[A] person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." (quoting United States v. Mendenhall, 446 U.S. 544, 554 (1980))). The standard for submission is also objective, see United States v. Salazar, 609 F.3d at 1064 (citing United States v. Cardoza, 129 F.3d 6, 14 n.4 (1st Cir. 1997)), but "[s]ubmission 'requires, at minimum, that a suspect manifest compliance with police orders,'" United States v. Roberson, 864 F.3d at 1122 (quoting United States v. Mosley, 743 F.3d 1317, 1326 (10th Cir. 2014)).  For purposes of analyzing Fourth Amendment seizures, the Tenth Circuit has divided interactions between police and citizens into three categories: (i) consensual encounters; (ii) investigative stops; and (iii) arrests.  See United States v. Samilton, 56 F.4th 820 (10th Cir. 2022); Oliver v. Woods, 209 F.3d 1179, 1186 (10th Cir. 2000).

> ### 1.    Consensual Encounters.

A consensual encounter occurs when a police officer approaches a person to ask questions under circumstances where a reasonable person would feel free to refuse to answer and to end the encounter.  See Oliver v. Woods, 209 F.3d at 1186.  For example, officers generally may "go to a person's home to interview him."  United States v. Daoust, 916 F.2d 757, 758 (1st Cir. 1990).  "It is not improper for a police officer to call at a particular house and seek admission for the purpose of investigating a complaint or conducting other official business."  1 Wayne LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 2.3(b), at 769 (6th ed. 2020)("LaFave").

> ### 2.    Investigative Stops.

In United States v. King, 990 F.2d 1552 (10th Cir. 1993), the Tenth Circuit notes: "Terry was the first case to recognize that 'the Fourth Amendment governs "seizures" of the person . . . [other than] arrests' and created a 'narrowly drawn' exception to the probable cause requirement

for lesser government intrusions into an individual's liberty." United States v. King, 990 F.2d at

1557 (first quoting Terry v. Ohio, 392 U.S. 1, 16 (1968), and then quoting Terry v. Ohio, 392 U.S.

at 27). The Tenth Circuit recognizes that, in Terry v. Ohio, the Supreme Court identifies two police

actions: (i) an investigative detention -- a "stop"; and (ii) a protective search -- a "frisk." United

States v. King, 990 F.2d at 1557 (citing United States v. Sokolow, 490 U.S. 1, 7 (1989); Adams v.

Williams, 407 U.S. 143, 147-48 (1972)). The Tenth Circuit explains:

> Terry has come to stand for two distinct propositions -- an investigative detention
> ("stop") in which a police officer, for the purpose of investigation, may briefly
> detain a person on less than probable cause, . . . and a protective search ("frisk")
> which permits an officer, in the course of an investigative detention, to conduct a
> limited search for weapons for his or her own protection.

United States v. King, 990 F.2d at 1557. When evaluating either of these actions, a court asks

whether the action was reasonable under the Fourth Amendment. See United States v. Wilson, 96

F. App'x 640, 643 (10th Cir. 2004); United States v. King, 990 F.2d at 1557.

### 3.    Investigative Detentions and Reasonable Suspicion.

A police-citizen encounter that is not consensual may be a Constitutional investigative

detention. See Dorato v. Smith, 108 F. Supp. 3d at 1118. An investigative detention occurs when

an officer stops and briefly detains a person "'in order to determine his identity or to maintain the

status quo momentarily while obtaining more information.'" Oliver v. Woods, 209 F.3d at 1186

(quoting Adams v. Williams, 407 U.S. at 146). Such brief investigative detentions must meet two

distinct requirements to be "reasonable" under the Fourth Amendment. Dorato v. Smith, 108

F. Supp. 3d at 1118. First, the officer "'must have a particularized and objective basis for

suspecting the particular person stopped of criminal activity.'" Oliver v. Woods, 209 F.3d at 1186

(quoting United States v. Cortez, 449 U.S. 411, 417-18 (1981)). Second, the investigative

detention that follows the stop must be "reasonably related in scope to the circumstances" which

justifies the stop in the first place, Terry v. Ohio, 392 U.S. at 20, because the Fourth Amendment

imposes "limitations on both the length of the detention and the manner in which it is carried out," United States v. Holt, 264 F.3d 1215, 1229 (10th Cir. 2001).

"For reasonable suspicion to exist, an officer 'need not rule out the possibility of innocent conduct'; he or she simply must possess 'some minimal level of objective justification' for making the stop." United States v. Winder, 557 F.3d 1129, 1134 (10th Cir. 2009)(quoting United States v. Vercher, 358 F.3d 1257, 1261 (10th Cir. 2004)). Information "falling 'considerably short' of a preponderance standard" will meet the standard for reasonable suspicion. United States v. Winder, 557 F.3d at 1134 (quoting United States v. Arvizu, 534 U.S. 266, 274 (2002)). See Illinois v. Wardlow, 528 U.S. 119, 123 (2000)("'[R]easonable suspicion' is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence.").

### 4.    **Frisks**.

A "frisk" is "a protective search . . . which permits an officer, in the course of an investigative detention, to conduct a limited search for weapons for his or her own protection." United States v. King, 990 F.2d at 1557 (citing Adams v. Williams, 407 U.S. at 147-48)). An officer may "stop and frisk" an individual under the Fourth Amendment if a reasonably prudent person "in the circumstances would be warranted in the belief that his safety or that of others was in danger." Terry v. Ohio, 392 U.S. at 27. "The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." Terry v. Ohio, 392 U.S. at 27. A frisk "must . . . be confined in scope to an intrusion reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer." Terry v. Ohio, 392 U.S. at 29. In evaluating the validity of the stop-and-frisk, a court should consider the totality of

the circumstances.  See Florida v. Bostick, 501 U.S. 429, 436 (1991).

    5.    **Traffic Stops.**

    "'A traffic stop is a seizure within the meaning of the Fourth Amendment  . . . .'" United States v. Holt, 264 F.3d at 1220 (quoting United States v. Hunnicutt, 135 F.3d 1345, 1348 (10th Cir. 1998)).  "'For the duration of a traffic stop,  . . .  a police officer effectively seizes everyone in the vehicle, the driver and all passengers.'" United States v. White, 584 F.3d 935, 945 (10th Cir. 2009)(quoting Arizona v. Johnson, 555 U.S. 323, 327 (2009)).  "This seizure implicates a passenger's Fourth Amendment interests to the same degree as the driver's." United States v. Wilson, 96 F. App'x at 643 (citing United States v. Erwin, 875 F.2d 268, 270 (10th Cir. 1989)). "Therefore, both the driver and passenger have standing to challenge the constitutionality of the initial stop." United States v. White, 584 F.3d at 945.  See United States v. Wilson, 96 F. App'x at 643 ("Wilson does not assert any such interest in the truck or its contents[;] [n]evertheless, Wilson may, as he does here, 'contest the lawfulness of his own detention and seek to suppress evidence found in the vehicle as the fruit of the illegal detention.'" (quoting United States v. Nava-Ramirez, 210 F.3d at 1131, and citing United States v. Gama-Bastidas, 142 F.3d 1233, 1239 (10th Cir. 1998); United States v. Shareef, 100 F.3d 1491, 1500 (10th Cir. 1996))).  The Tenth Circuit "reject[s] any notion that a vehicular stop detains for Fourth Amendment purposes only the driver simply because the passenger may be free to depart." United States v. Erwin, 875 F.2d at 270.

    The Terry v. Ohio framework applies whether the traffic stop is based on probable cause or reasonable suspicion.  See United States v. Holt, 264 F.3d at 1230.  "[B]ecause 'the ultimate touchstone of the Fourth Amendment is reasonableness,'" Kentucky v. King, 563 U.S. at 459 (quoting Brigham City v. Stuart, 547 U.S. at 403), courts

> assess the reasonableness of a routine traffic stop under the principles laid out for investigative detentions in Terry v. Ohio, 392 U.S. 1 (1968), considering "whether the officer's action was justified at its inception, and whether it was reasonably

related in scope to the circumstances which justified the interference in the first
place."

United States v. Wilson, 96 F. App'x at 643 (quoting United States v. Holt, 264 F.3d at 1220).  A

court must examine "both the length of the detention and the manner in which it is carried out,"

United States v. Holt, 264 F.3d at 1230, "keeping in mind that an officer may extend the duration

and scope of the initial detention based on 'an objectively reasonable and articulable suspicion that

illegal activity has occurred or is occurring,'" United States v. Wilson, 96 F. App'x at 643 (quoting

United States v. Caro, 248 F.3d 1240, 1244 (10th Cir. 2001)).  "When the stop is extended based

on reasonable suspicion, the further detention must, like the original traffic stop, 'be temporary,

lasting no longer than necessary to effectuate the purpose of the [further] detention, and the scope

of the [further] detention must be carefully tailored to its underlying justification.'"  United States

v. Wilson, 96 F. App'x at 644 (quoting United States v. Wood, 106 F.3d 942, 945 (10th Cir.

1997))(brackets in United States v. Wilson, but not in United States v. Wood).  "A traffic stop is

justified at its inception if an officer has . . . reasonable articulable suspicion that a particular

motorist has violated any of the traffic . . . regulations of the jurisdiction."  United States v. Winder,

557 F.3d at 1134.  See United States v. Martinez, No. CR 24-0707 JB, 2024 U.S. Dist. LEXIS

214431, at *94 (D.N.M. November 25, 2024)(Browning, J.)(concluding that the police officer

initiates Constitutionally the traffic stop of a car, because there is probable cause to believe that at

least some of the car's passengers do not have their seatbelts fastened).

      **6.**      **Arrests.**

An arrest is a seizure that is "characterized by highly intrusive or lengthy search or

detention,"  Oliver v. Woods, 209 F.3d at 1186, that is "reasonable only if supported by probable

cause,"  United States v. Hammond, 890 F.3d 901, 904 (10th Cir. 2018).  A police-citizen encounter

that goes beyond the limits of a stop under Terry v. Ohio is an arrest.  See United States v. Perdue,

8 F.3d 1455, 1462 (10th Cir. 1993)("An encounter between police and an individual which goes

beyond the limits of a <u>Terry</u> stop, however, may be constitutionally justified only by probable cause

or consent."). The general rule is that "the use of firearms, handcuffs, and other forceful

techniques" is sufficiently intrusive to signal that a person has been placed under arrest.[4] <u>United

States v. Melendez-Garcia</u>, 28 F.3d 1046, 1052-53 (10th Cir. 1994). <u>See</u> <u>Florida v. Royer</u>, 460 U.S.

491, 499 (1983).

"Inasmuch as an arrest exceeds an investigative stop's limited scope or duration, it must be

supported by probable cause." <u>United States v. Rodriguez</u>, 836 F. Supp. 2d 1258, 1288 (D.N.M.

2011)(Browning, J.). <u>See</u> <u>Wilson v. Jara</u>, 866 F. Supp. 2d 1270, 1292 (D.N.M.

2011)(Browning, J.)("Probable cause must support an arrest, 'characterized by highly intrusive or

lengthy search or detention.'" (quoting <u>Oliver v. Woods</u>, 209 F.3d at 1185)), <u>aff'd</u>, 512

F. App'x 841 (10th Cir. 2013)(unpublished). "Probable cause to arrest exists only when the 'facts

and circumstances within the officers' knowledge, and of which they have reasonably trustworthy

information, are sufficient in themselves to warrant a man of reasonable caution in the belief that

an offense has been or is being committed.'" <u>United States v. Valenzuela</u>, 365 F.3d 892, 896-97

(10th Cir. 2004)(quoting <u>United States v. Edwards</u>, 242 F.3d 928, 934 (10th Cir. 2001)). Although

"[p]robable cause does not require facts sufficient for a finding of guilt . . . , it does require 'more

than mere suspicion.'" <u>United States v. Morris</u>, 247 F.3d 1080, 1088 (10th Cir. 2001)(quoting

---

[4]The use of handcuffs, however, does not always elevate a detention into an arrest.
<u>See</u> <u>United States v. Albert</u>, 579 F.3d 1188, 1195 (10th Cir. 2009)("[W]e have approved the use of
handcuffs in the context of a <u>Terry</u> stop."); <u>Pierre-Louis v. Schake</u>, No. CIV 12-0527, 2014 WL
1954783, at *44-49 (D.N.M. April 30, 2014)(Browning, J.)(concluding that the defendant police
officer acted reasonably in handcuffing the plaintiff, whom he suspected had recently assaulted a
person on the side of the road by threatening him with a gun); <u>United States v. Reyes-Vencomo</u>,
866 F. Supp. 2d 1304, 1330 (D.N.M. 2012)(Browning J.)("The use of handcuffs . . . does not
always elevate a detention into an arrest.").

United States v. Vazquez-Pulido, 155 F.3d 1213, 1216 (10th Cir. 1998)).  The Supreme Court has

made the following distinction between reasonable suspicion, which is sufficient for an

investigatory stop under Terry v. Ohio, and probable cause, which is required before an arrest can

be made:

> Reasonable suspicion is a less demanding standard than probable cause not only in
> the sense that reasonable suspicion can be established with information that is
> different in quantity or content than that required to establish probable cause, but
> also in the sense that reasonable suspicion can arise from information that is less
> reliable than that required to show probable cause.

Alabama v. White, 496 U.S. 325, 330 (1990).

Probable cause is measured against an objective standard.  See Beck v. Ohio, 379 U.S. 89,

96 (1964).  "The subjective belief of an individual officer as to whether there was probable cause

for making an arrest is not dispositive."  United States v. Valenzuela, 365 F.3d at 896-97 (citing

Florida v. Royer, 460 U.S. at 507, and United States. v. Treto-Haro, 287 F.3d 1000, 1006 (10th Cir.

2002)).  Thus, the primary consideration is "whether a reasonable officer would have believed that

probable cause existed to arrest the defendant based on the 'information possessed by the

[arresting] offic[er].'"  Olsen v. Layton Hills Mall, 312 F.3d 1304, 1312 (10th Cir. 2002) (quoting

Romero v. Fay, 45 F.3d 1472, 1476 (10th Cir. 1995))(alterations in Olsen v. Layton Hills Mall,

but not in Romero v. Fay).

**7.    When a Detention Becomes an Arrest.**

The Tenth Circuit holds that a police-citizen encounter which goes beyond an investigative

stop's limits is an arrest that probable cause or consent must support to be valid.  See United States

v. Perdue, 8 F.3d at 1462 ("An encounter between police and an individual which goes beyond the

limits of a Terry stop, however, may be constitutionally justified only by probable cause or

consent.").  "Terry stops must be limited in scope to the justification for the stop . . .  [and] the

intrusiveness of a search or seizure will be upheld if it was reasonable under the totality of the

circumstances." <u>United States v. Perdue</u>, 8 F.3d at 1462. "The government has the burden of demonstrating 'that the seizure it seeks to justify on the basis of a reasonable suspicion was sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure.'" <u>United States v. Perdue</u>, 8 F.3d at 1462 (quoting <u>Florida v. Royer</u>, 460 U.S. at 500).

The Court also engages in the balancing act of deciding when a detention becomes an arrest. In <u>United States v. Perea</u>, 374 F. Supp. 2d 961 (D.N.M. 2005)(Browning, J.), <u>aff'd sub nom.</u> <u>United States v. Burciaga-Burciaga</u>, 147 F. App'x 725 (10th Cir. 2005), the Court determines whether the police transformed the investigative detention into an arrest by drawing their weapons on the suspect, handcuffing him, and placing him in the back of a police car. <u>See</u> <u>United States v. Perea</u>, 374 F. Supp. 2d at 976. In that case, the Court determines that such measures are appropriate and do not elevate the investigative detention to the level of an arrest. <u>See</u> 374 F. Supp. 2d at 976. The Court recognizes that, "[i]n 'most scenarios,' when officers effectuate what would otherwise be considered a <u>Terry</u> stop by pointing guns at a suspect, that stop is elevated to an arrest, which requires probable cause." 374 F. Supp. 2d at 974 (quoting <u>United States v. Perdue</u>, 8 F.3d at 1463). <u>See</u> <u>United States v. Gama-Bastidas</u>, 142 F.3d at 1240 ("[T]he use of firearms, handcuffs, and other forceful techniques are justified only by probable cause or when 'the circumstances reasonably warrant such measures.'")(quoting <u>United States v. Perdue</u>, 8 F.3d at 1462); <u>United States v. Burciaga-Burciaga</u>, 147 F. App'x at 730 (affirming the Court's determination in <u>United States v. Perea</u> that the officers have reasonable suspicion to believe that the suspect might be armed and dangerous, justifying the officers' use of firearms and not transforming the vehicle stop into a formal arrest requiring probable cause).

There "exist[s], however, a limited set of circumstances in which officers may draw their guns at a suspect without transforming the stop into an arrest. 'The use of guns in connection with

a stop is permissible where the police reasonably believe the weapons are necessary for their protection.'" United States v. Perea, 374 F. Supp. 2d at 974 (quoting United States v. Perdue, at 1462).  See United States v. Merkley, 988 F.2d 1062, 1064 (10th Cir. 1993)(upholding reasonableness of a stop when officers detain the defendant at gunpoint and place him in handcuffs, where suspect threatens to kill someone and is pounding interior of truck with his fists); United States v. Lechuga, 925 F.2d 1035, 1040 (7th Cir. 1991)(holding that the officer's "drawing his gun but keeping it pointed to the street" is not "unreasonably intrusive"); United States v. Alexander, 907 F.2d 269, 272-73 (2d Cir. 1990)(holding that the law enforcement officers do not convert the stop into an arrest by "unholstering their guns and frisking" the defendant when they suspect that the defendant has "just completed a narcotics purchase," there are a number of "innocent bystanders on the crowded city street," and stopping a vehicle "is especially hazardous and supports the need for added safeguards").  Similarly, there are circumstances in which a seizure is not an arrest merely because the subject of the detention is placed in handcuffs.  See United States v. Merkley, 988 F.2d at 1064; United States v. Miller, 974 F.2d 953, 957 (8th Cir. 1992)("Numerous cases have held that a police officer's use of handcuffs can be a reasonable precaution during a Terry stop."); United States v. Hastamorir, 881 F.2d 1551, 1557 (11th Cir. 1989)("The handcuffing of Hastamorir constituted a Terry stop, and was a reasonable action designed to provide for the safety of the agents.").  United States v. Perea is one of those unique cases, because the police have reasonable cause to believe that the person whom they are detaining is the suspect whom they seek to arrest -- a man wanted for murder who, it is believed, might be armed and dangerous.  See 374 F. Supp. 2d at 976.  The Tenth Circuit affirms the Court's determination that the stop is not an arrest:

> The officers' conduct during the felony stop was appropriate in relation to the
> perceived threat.  The measures taken during a Terry stop must be "reasonably

related in scope to the circumstances which justified the interference in the first place" and may not go beyond what is necessary for officer safety.  United States v. King, 990 F.2d 1552, 1563 (10th Cir. 1993)(quoting Terry v. Ohio, 392 U.S. 1, 20 . . . (1968)).  The felony stop was justified by suspicion that someone in the Escalade might have a gun, or at least was dangerous.  The officers displayed their weapons only as long as necessary to ensure that the vehicle and its occupants posed no threat.  The officers put their guns away as soon as they handcuffed Mr. Burciaga, placed him in the back of a police car, and confirmed that no one else was in the car.

United States v. Burciaga-Burciaga, 147 F. App'x at 730.

### 8.  Officers Have a Duty to Investigate Easily Accessible Evidence Before Making an Arrest.

"[T]he Fourth Amendment requires officers to reasonably interview witnesses readily available at the scene, investigate basic evidence, or otherwise inquire if a crime has been committed at all before invoking the power of warrantless arrest and detention."  Romero v. Fay, 45 F.3d at 1476-77.  Police officers "may not ignore easily accessible evidence and thereby delegate their duty to investigate [to others]."  Baptiste v. J.C. Penney Co., 147 F.3d 1252, 1259 (10th Cir. 1998).  However, "[o]nce probable cause is established, an officer is not required to continue to investigate for exculpatory evidence before arresting a suspect."  Garcia v. Casuas, No. CIV 11-0011, 2011 WL 7444745, at *49 (D.N.M. December 8, 2011)(Browning, J.)(citing Cortez v. McCauley, 478 F.3d 1108, 1121 n.18 (10th Cir. 2007)).

### LAW REGARDING THE EXCLUSIONARY RULE

"When the government obtains evidence though an unconstitutional search, the evidence is inadmissible under the exclusionary rule unless an exception applies."  United States v. Neugin, 958 F.3d 924, 931 (10th Cir. 2020).  See Sanchez-Llamas v. Oregon, 548 U.S. 331, 332-33 (2006)("[T]he exclusionary rule has been used primarily to deter certain Fourth and Fifth Amendment violations, including, e.g., unconstitutional searches and seizures, and confessions exacted in violation of the right against compelled self-incrimination or due process."); United

States v. Calandra, 414 U.S. 338, 347 (1974)("Under this rule, evidence obtained in violation of the Fourth Amendment cannot be used in a criminal proceeding against the victim of the illegal search and seizure.").  "In addition, a defendant also may suppress any other evidence deemed to be 'fruit of the poisonous tree,' (i.e., evidence discovered as a direct result of the unlawful activity), by showing the requisite factual nexus between the illegality and the challenged evidence." United States v. Olivares-Rangel, 458 F.3d 1104, 1108-09 (10th Cir. 2006).  The exclusionary rule applies if the defendant can show, by a preponderance of the evidence, a constitutional violation under the Fourth Amendment, and a causal nexus between the violation and the evidence he or she seeks to excluded.  See United States v. Torres-Castro, 470 F.3d 992, 999 (10th Cir. 2006).  Once the defendant makes this showing, the burden shifts to the United States to prove that an exception to the exclusionary rule applies.  See United States v. Torres-Castro, 470 F.3d at 999; United States v. Ringleb, No. CR 22-0190 JB, 2025 2025 U.S. Dist. LEXIS 75030, at *1-3 (D.N.M. April 18, 2025)(Browning, J.)(holding that police officers violate the Fourth Amendment when they enter a backyard unlawfully, there is sufficient factual nexus between the unlawful search and the challenged evidence, and no exclusionary rule exception applies).  The Supreme Court has recognized several exceptions to the exclusionary rule.  See United States v. Alabi, 943 F. Supp. 2d 1201, 1255 (D.N.M. 2013)(Browning, J.), aff'd, 597 F. App'x 991 (10th Cir. 2015).

1. **Attenuation Doctrine.**

One exception to the exclusionary rule is the attenuation doctrine: "Evidence is admissible when the connection between unconstitutional police conduct and the evidence is remote or has been interrupted by some intervening circumstance, so that 'the interest protected by the constitutional guarantee that has been violated would not be served by suppression of the evidence obtained.'" Utah v. Strieff, 579 U.S. at 238 (2016)(quoting Hudson v. Michigan, 547 U.S. 586, 593 (2006)).  "The attenuation doctrine evaluates the causal link between the government's

unlawful act and the discovery of evidence." Utah v. Strieff, 579 U.S. at 238. To determine whether there are sufficient intervening acts to break the causal chain between the unlawful stop and the discovery of evidence, courts examine the three factors that the Supreme Court articulates in Brown v. Illinois, 422 U.S. 590 (1975).

First, the Court looks to the "temporal proximity" between the unconstitutional conduct and the discovery of evidence to determine how closely the discovery of evidence followed the unconstitutional search. Brown v. Illinois, 422 U.S. at 603. This factor often favors suppressing the evidence unless "substantial time" elapses between an unlawful act and the time the evidence is obtained. Kaupp v. Texas, 538 U.S. 626, 633 (2003)(per curiam). The Supreme Court concludes that a time span of "less than two hours" between the unconstitutional arrest and the confession is too short an interval, and, therefore, counsels in favor of suppressing the evidence. Brown v. Illinois, 422 U.S. at 604.

Second, the Court considers "the presence of intervening circumstances." Brown v. Illinois, 422 U.S. at 603-04. The Supreme Court concludes that there are sufficient intervening circumstances to admit the evidence in Segura v. United States, 468 U.S. 796 (1984), where it applies the independent source doctrine. See 468 U.S. at 799-801, 814. There, agents have probable cause to believe that apartment occupants are dealing cocaine. See 468 U.S. at 799-800. They seek a warrant. See 468 U.S. at 799-800. In the meantime, they enter the apartment, arrest the occupant, and discover evidence of drug activity during their security sweep. See 468 U.S. at 800-01. The next evening, they obtain a search warrant. See 468 U.S. at 800-01. The Supreme Court deems the evidence admissible, notwithstanding the illegal search, because the information supporting the warrant is "wholly unconnected with the entry and was known to the agents well before the initial entry." 468 U.S. at 814. The Supreme Court suggests that "the existence of a

valid warrant favors finding that the connection between unlawful conduct and the discovery of evidence is 'sufficiently attenuated to dissipate the taint.'" Utah v. Strieff, 579 U.S. at 240 (quoting Segura v. United States, 468 U.S. at 815).

Third, and "particularly" significant under the Supreme Court's analysis, the Supreme Court examines "the purpose and flagrancy of the official misconduct." Brown v. Illinois, 422 U.S. at 604. See Utah v. Strieff, 579 U.S. at 239 (observing that the third factor is particularly significant). The exclusionary rule exists to deter police misconduct. See Davis v. United States, 564 U.S. 229, 236-37 (2011). The third factor reflects this rationale by favoring exclusion "only when the police misconduct is most in need of deterrence -- that is, when it is purposeful or flagrant." Utah v. Strieff, 579 U.S. at 241. Mere negligence in violating the Fourth Amendment "hardly rise[s] to a purposeful or flagrant violation." Utah v. Strieff, 579 U.S. at 241. See United States v. Ramos, 194 F. Supp. 3d 1134, 1185-87 (D.N.M. 2016)(Browning, J.).

### 2.        Good-Faith Exception.

Recognizing that the exclusionary rule's "sole purpose . . . is to deter future Fourth Amendment violations," the Supreme Court holds that evidence is admissible where the officer who obtains the evidence through an unlawful search or seizure acts in good faith. United States v. Davis, 564 U.S. 229, 236-37 (2011). To determine whether the good-faith exception applies, courts must balance the deterrent effect of excluding the evidence against "the 'substantial social costs' generated by the rule." United States v. Davis, 564 U.S. at 237 (quoting United States v. Leon, 468 U.S. 897, 907 (1984)). The Supreme Court explains "that the deterrence benefits of exclusion 'var[y] with the culpability of the law enforcement conduct' at issue." United States v. Davis, 564 U.S. at 238 (quoting Herring v. United States, 555 U.S. 135, 143 (2009))(brackets in United States v. Davis, but not in Herring v. United States). Consequently, "[w]hen the police exhibit 'deliberate,' 'reckless,' or 'grossly negligent' disregard for Fourth Amendment rights, the

deterrent value of exclusion is strong and tends to outweigh the resulting costs." United States v. Davis, 564 U.S. at 238 (quoting Herring v. United States, 555 U.S. at 144). By contrast, "when the police act with an objectively reasonable good-faith belief that their conduct is lawful, or when their conduct involves only simple, isolated negligence, the deterrence rationale loses much of its force, and exclusion cannot 'pay its way.'" United States v. Davis, 564 U.S. at 238 (internal quotation marks have no citation). "In those situations, officers act with an 'objectively reasonable good-faith belief that their conduct is lawful,' . . . precluding the application of the exclusionary remedy." United States v. Pemberton, 94 F.4th 1130, 1137 (10th Cir. 2024)(quoting United States v. Davis, 564 U.S. at 257).

The good-faith exception most commonly arises in the context of warrant-based searches to allow entry of evidence obtained by officers acting "in objectively reasonable reliance on a warrant issued by a detached and neutral magistrate that subsequently is determined to be invalid." Massachusetts v. Sheppard, 468 U.S. 981, 987-88 (1984). "When a search is conducted pursuant to a warrant that is based on illegally obtained information," however, "a court is not to blindly apply the good-faith exception." United States v. Alabi, 943 F. Supp. 2d at 1260. "Instead, the court is to consider the warrant with the illegally obtained information excluded and determine, based on the remaining information, whether probable cause nevertheless existed." United States v. Alabi, 943 F. Supp. 2d at 1260. If the warrant affidavit's remaining content establishes probable cause, the search pursuant to that warrant is appropriate, and the evidence is admissible:

> When a warrant is tainted by some unconstitutionally obtained information, we nonetheless uphold the warrant if there was probable cause absent that information. [United States v. Cusumano, 83 F.3d 1247, 1250 (10th Cir. 1996)]. "An affidavit containing erroneous or unconstitutionally obtained information invalidates a warrant if that information was critical to establishing probable cause. If, however, the affidavit contained sufficient accurate or untainted evidence, the warrant is nevertheless valid." United States v. Snow, 919 F.2d 1458, 1460 (10th Cir. 1990).

United States v. Sims, 428 F.3d 945, 954 (10th Cir. 2005).  See United States v. Bullcoming, 22 F.4th 883, 890-92 (10th Cir.), cert. denied, 142 S.Ct. 2805 (2022).  "The apparent rationale for this rule is that one officer cannot execute a warrant 'in good faith' if it contains information that he or a fellow officer obtained illegally."  United States v. Alabi, 943 F. Supp. 2d at 1260 (quoting United States v. Herrera, 444 F.3d 1238, 1249 (10th Cir. 2006)).

In United States v. Leon, the Supreme Court concludes that a court need not suppress evidence seized pursuant to a facially valid warrant which later turns out to lack probable cause, as long as police are acting in good-faith reliance on that warrant.  See 468 U.S. at 922-23;  id. at 468 U.S. at 905.  The Supreme Court notes that excluding this evidence will not deter police misconduct, as the officer took all of the necessary steps to comply with the Fourth Amendment and reasonably thinks his warrant, and, thus, his search, is valid.  See United States v. Leon, 468 U.S. at 918-19.  The Supreme Court explains that, when a warrant is issued on less than probable cause, the person whose conduct the law wishes to deter is the issuing judge and that excluding the evidence will not have a significantly deterrent effect on judicial conduct.  See 468 U.S. at 916-17.  "The Tenth Circuit therefore now applies the rule that, in cases where the police obtained a warrant but the affidavit supporting the warrant does not establish probable cause, suppression of the evidence found is generally not warranted, so long as the officers relied in good faith on the warrant."  United States v. Martinez, 696 F. Supp. 2d 1216, 1244 (D.N.M. 2010)(Browning, J.)(citing United States v. Tuter, 240 F.3d 1292, 1300 (10th Cir. 2001); United States v. Danhauer, 229 F.3d 1002, 1007 (10th Cir. 2000)).

> "[T]he suppression of evidence obtained pursuant to a warrant should be ordered . . . only in those unusual cases in which exclusion will further the purposes of the exclusionary rule," [United States v. Leon, 468 U.S.] at 918 . . . .  "Where an officer acting with objective good faith obtains a search warrant from a detached and neutral magistrate and the executing officers act within its scope, there is nothing to deter."  United States v. Nolan, 199 F.3d 1180, 1184 (10th Cir. 1999).

United States v. Tuter, 240 F.3d at 1298-99.

Furthermore, the Tenth Circuit has explained that, "[u]nder Leon, we presume good-faith when an officer acts pursuant to a warrant unless one of 'four contexts' appl[ies]."  United States v. Barajas, 710 F.3d 1102, 1110 (10th Cir. 2013).

> First, evidence should be suppressed if the issuing magistrate was misled by an affidavit containing false information or information that the affiant would have known was false if not for his "reckless disregard of the truth."  [United States v. Leon, 468 U.S.] at 923 . . . .  Second, the exception does not apply when the "issuing magistrate wholly abandon[s her] judicial role."  Id.  Third, the good-faith exception does not apply when the affidavit in support of the warrant is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable."  Id. (quotation omitted).  Fourth, the exception does not apply when a warrant is so facially deficient that the executing officer could not reasonably believe it was valid.  See id.

United States v. Danhauer, 229 F.3d at 1007 (quoting United States v. Leon, 468 U.S. at 922-23).

See United States v. Perrine, 518 F.3d 1196, 1206-07 (10th Cir. 2008).  "If any of these situations is present, the good-faith exception should not be applied, and the evidence should be excluded." United States v. Romero, 743 F. Supp. 2d at 1316.

In Herring v. United States, the Supreme Court clarifies that, "[t]o trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system."  555 U.S. at 144.  Officers arrest Herring pursuant to an arrest warrant listed in the Dale County, Alabama, warrant database, and discover drugs and a gun on Herring's person during a search incident to arrest.  See 555 U.S. at 137.  Herring is then indicted on federal gun- and drug-possession charges. See 555 U.S. at 138.  It turns out, however, that the warrant under which the officers arrested Herring had been recalled, but the database had not been updated to reflect that recall.  See 555 U.S. at 138.  Asserting that the evidence found during the search is fruit of an unlawful arrest, Herring seeks to suppress it.  See 555 U.S. at 138.

The Supreme Court concludes that, although the police's failure to update the warrant database to reflect that Herring's warrant is withdrawn was negligent, the police's omission is not reckless or deliberate.  See 555 U.S. at 140.  The Supreme Court reiterates its holding in United States v. Leon: "When police act under a warrant that is invalid for lack of probable cause, the exclusionary rule does not apply if the police acted 'in objectively reasonable reliance' on the subsequently invalidated search warrant."  Herring v. United States, 555 U.S. at 142 (quoting United States v. Leon, 468 U.S. at 922).  The Supreme Court further explains that "'evidence should be suppressed only if it can be said that the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional.'"  Herring v. United States, 555 U.S. at 143 (quoting Illinois v. Krull, 480 U.S. 340, 348-49 (1987)).  As long as the "police have [not] been shown to be reckless in maintaining [the] warrant system, or to have knowingly made false entries to lay the groundwork for future false arrests," exclusion of evidence is not warranted when the arrest was made on objectively reasonable reliance on a warrant that had been subsequently recalled.  Herring v. United States, 555 U.S. at 146.

In Davis v. United States, the Supreme Court confronts the question whether to apply the exclusionary rule when police conduct a search in objectively reasonable reliance on binding judicial precedent.  See 564 U.S. at 239.  At the time of the officer's search, the Supreme Court had not yet decided Arizona v. Gant, 556 U.S. 332 (2009), which held that the Fourth Amendment requires officers to demonstrate a continuing threat to their safety posed by the arrestee or a need to preserve evidence related to the crime of the arrest to justify a warrantless vehicular search incident to arrest.  See Arizona v. Gant, 556 U.S. at 341-48.  The United States Court of Appeals for the Eleventh Circuit had interpreted the Supreme Court's decision in New York v. Belton, 453 U.S. 454 (1981), as establishing a bright-line rule authorizing the search of a vehicle's passenger

compartment incident to a recent occupant's arrest.  See United States v. Gonzalez, 71 F.3d 819, 825 (11th Cir. 1996).  Although the officers' search incident to the defendant's arrest "was in strict compliance with then-binding Circuit law and was not culpable in any way," it was unconstitutional under Arizona v. Gant.  United States v. Davis, 564 U.S. at 239-40.

The Supreme Court determines that the "acknowledged absence of police culpability dooms [the defendant's] claim."  United States v. Davis, 564 U.S. at 240.  The Supreme Court explains that "[p]olice practices trigger the harsh sanction of exclusion only when they are deliberate enough to yield 'meaningful' deterrence, and culpable enough to be 'worth the price paid by the justice system.'"  United States v. Davis, 564 U.S. at 240 (quoting Herring v. United States, 555 U.S. at 144).  The Supreme Court states: "The conduct of the officers here was neither of these things.  The officers who conducted the search did not violate [the defendant's] Fourth Amendment rights deliberately, recklessly, or with gross negligence.  Nor does this case involve any 'recurring or systemic negligence' on the part of law enforcement."  United States v. Davis, 564 U.S. 240 (quoting and citing Herring v. United States, 555 U.S. at 144).  The Supreme Court concludes that, "[u]nless the exclusionary rule is to become a strict-liability regime, it can have no application in this case."  United States v. Davis, 564 U.S. at 240.

### 3.    Inevitable-Discovery Exception.

Under the inevitable-discovery exception, the exclusionary rule does not apply if the government can prove by a preponderance that "the evidence inevitably would have been discovered by lawful means."  United States v. Braxton, 61 F.4th 830, 833 (10th Cir. 2023)(quoting United States v. Neugin, 958 F.3d at 931).  See United States v. Christy, 739 F.3d 534, 540 (10th Cir. 2014).  "The government possesses the burden of proving by a preponderance of the evidence that the evidence at issue would have been discovered without the Fourth Amendment violation."  United States v. Cunningham, 413 F.3d 1199, 1203 (10th Cir. 2005).  For the inevitable-discovery

exception to apply, there must be a "lawful police investigation [that] inevitably would have discovered" the evidence in question. United States v. Owens, 782 F.2d 146, 152 (10th Cir. 1986). The Tenth Circuit clarifies, however, that the inevitable-discovery exception does not require an independent investigation that would have discovered the evidence in question, so long as "the lawful means of discovery are 'independent of the constitutional violation.'" United States v. Christy, 739 F.3d at 540-41 (quoting United States v. Larsen, 127 F.3d 984, 987 (10th Cir. 1997)). The Tenth Circuit has urged courts to consider the "'danger of admitting unlawfully obtained evidence on the strength of some judge's speculation that it would have been discovered legally anyway.'" United States v. Owens, 782 F.2d at 152-53 (quoting United States v. Romero, 692 F.2d 699, 704 (10th Cir. 1982)). Accordingly, "courts should be realistic, if not skeptical, when assessing the probability that law-enforcement officers would inevitably have uncovered the challenged evidence through an independent investigation." United States v. Martinez, 696 F. Supp. 2d 1216, 1244 (D.N.M. 2010)(Browning, J.).

The Tenth Circuit further explains that, "[w]hile the inevitable discovery exception does not apply in situations where the government's only argument is that it had probable cause for the search, the doctrine may apply where, in addition to the existence of probable cause, the police had taken steps in an attempt to obtain a search warrant." United States v. Souza, 223 F.3d 1197, 1203 (10th Cir. 2000). The Tenth Circuit states that "a court may apply the inevitable discovery exception only when it has a high level of confidence that the warrant in fact would have been issued and that the specific evidence in question would have been obtained by lawful means." United States v. Souza, 223 F.3d at 1205. In United States v. Souza, 223 F.3d 1197, the Tenth Circuit adopts four factors to determine "how likely it is that a warrant would have been issued and that the evidence would have been found pursuant to a warrant":

> 1) "the extent to which the warrant process has been completed at the time those
> seeking the warrant learn of the search"; 2) the strength of the showing of probable
> cause at the time the search occurred; 3) whether a warrant ultimately was obtained,
> albeit after the illegal entry; and 4) "evidence that law enforcement agents 'jumped
> the gun' because they lacked confidence in their showing of probable cause and
> wanted to force the issue by creating a fait accompli."

223 F.3d at 1204 (quoting United States v. Cabassa, 62 F.3d 470, 473-74, 473 n.2 (2d Cir. 1995)).

See United States v. Cunningham, 413 F.3d at 1204-05 (applying the four factors that United States

v. Souza outlines).  In United States v. Christy, the Court applies the four United States v. Souza

factors and determines that the inevitable-discovery exception applies.  See United States v.

Christy, 810 F. Supp. 2d 1219, 1275-79 (D.N.M. 2011), aff'd, 739 F.3d 534 (10th Cir. 2014)

## ANALYSIS

The Court undertakes its analysis in three sections.  First, the Court concludes that the

traffic stop is lawful, because Rodriguez has reasonable suspicion that O. Talamante-Sanchez'

license plate is not illuminated properly, in violation of N.M.S.A. § 66-3-805(C), and the stop is

reasonably related in scope to issuing a traffic ticket.  Second, the Court concludes that Rodriguez'

additional questioning of O. Talamante-Sanchez is lawful, because: (i) O. Talamante-Sanchez

consents freely to additional questioning; and (ii) even if O. Talamante-Sanchez does not consent

freely, Rodriguez extends the traffic stop lawfully, because he has reasonable suspicion that

O. Talamante-Sanchez has committed another crime.  Third, the Court concludes that the vehicle

search is lawful, because O. Talamante-Sanchez consents expressly and freely to a full search of

the truck.  Accordingly, the Court denies the O. Talamante-Sanchez Motion to Suppress and the

J. Talamante-Sanchez Motion to Suppress

## I.    **THE TRAFFIC STOP IS LAWFUL.**

The initial traffic stop is lawful, because Rodriguez has reasonable suspicion that

O. Talamante-Sanchez' license plate is not illuminated properly in violation of N.M.S.A. § 66-3-

805(C). "Whether a traffic stop is constitutional is a two-step inquiry." United States v. Hanrahan, 508 F.3d 962, 966 (10th Cir. 2007). "First, we determine whether the officer's action was justified from its inception, and, second, whether the action was reasonably related in scope to the circumstances that justified the interference." United States v. Wallace, 429 F.3d 969, 974 (10th Cir. 2005).

The traffic stop is justified at its inception, because Rodriguez has reasonable suspicion that O. Talamante-Sanchez is violating N.M.S.A. § 66-3-805(C). "A traffic stop is justified at its inception if an officer has . . . reasonable articulable suspicion that a particular motorist has violated any of the traffic . . . regulations of the jurisdiction." United States v. Winder, 557 F.3d at 1134. N.M.S.A. § 66-3-805(C) requires that license plates be illuminated independently; a trailing vehicle's headlights do not satisfy the statute. See N.M.S.A. § 66-3-805(C)("Either a tail lamp or a separate lamp shall be so constructed and placed as to illuminate with a white light the rear registration plate and render it clearly legible from a distance of fifty feet to the rear."). Rodriguez observes that O. Talamante-Sanchez' rear license plate is not illuminated independently in a way that makes it clearly legible from fifty feet away. See FOF No. 3, at 4. That Rodriguez' headlights illuminate O. Talamante-Sanchez' license plate does not make O. Talamante-Sanchez' license plate compliant with N.M.S.A. § 66-3-805(C). See N.M.S.A. § 66-3-805(C). Because O. Talamante-Sanchez' vehicle does not have a light that illuminates the license plate in a way that makes it clearly legible from fifty feet away, Rodriguez has "reasonable articulable suspicion" that O. Talamante-Sanchez is violating N.M.S.A. § 66-3-805(C). United States v. Winder, 557 F.3d at 1134. See United States v. Patterson, 472 F.3d 767, 775 (10th Cir. 2006)("Reasonable suspicion may be based on the officer's personal observation of a traffic violation."); United States v. Marquez-Diaz, 325 F. App'x 637, 642 (10th Cir. 2009)(holding that a traffic stop is reasonable

at its inception, because the officer observes a violation of N.M.S.A. § 66-3-805(C)).  Thus, the traffic stop is justified at its inception.

The traffic stop is reasonable in scope, because Rodriguez spends less than fifteen minutes asking permissible questions about O. Talamante-Sanchez' travel while he processes the traffic ticket.  "Because the officer's purpose is to address the traffic infraction, the stop may last no longer than is necessary to effectuate that purpose," and the "authority for the seizure therefore ends when the officer completes -- 'or reasonably should have [ ] completed' -- the tasks tied to the traffic infraction."  United States v. Valdez, 685 F. Supp. 3d 1110, 1158 (D.N.M. 2023)(Browning, J,)(quoting Rodriguez v. United States, 575 U.S. at 354)(brackets in United States v. Valdez, but not in Rodriguez v. United States).  "The Tenth Circuit has repeatedly held that officers may ask questions about a person's travel plans during a routine traffic stop without exceeding the traffic stop's permissible scope."  United States v. Ramos, 194 F. Supp. 3d 1134, 1169 (D.N.M. 2016)(Browning, J.), aff'd, 723 F. App'x 632 (10th Cir. 2018).  "The detention arising from a traffic stop does not become unreasonable merely because the officer asks questions unrelated to the initial purpose for the stop, provided those questions do not unreasonably extend the amount of time the subject is delayed."  United States v. Valenzuela, 494 F.3d 886, 888 (10th Cir. 2007).

The traffic stop ends when Rodriguez issues the traffic ticket and tells O. Talamante-Sanchez, the driver, that he is free to go, because, at that point, Rodriguez has completed the "tasks tied to the traffic infraction."  United States v. Valdez, 685 F. Supp. 3d at 1158.  At this moment, it has been less than fifteen minutes since Rodriguez stops O. Talamante-Sanchez, and Rodriguez has used that time to ask the Defendants questions about their travel, check if they have weapons, and process the traffic ticket.  See FOFs Nos. 1-34, at 3-11.  A fifteen-minute traffic stop where

the officer asks harmless questions about the driver's travel and whether the occupants are armed is reasonable.  See United States v. Valenzuela, 494 F.3d at 888; United States v. Ramos, 194 F. Supp. 3d at 1169.  Accordingly, the Court concludes that the traffic stop is lawful, because it is justified at its inception and is reasonably related in scope to issuing a traffic ticket.

## II.    RODRIGUEZ' ADDITIONAL QUESTIONING OF O. TALAMANTE SANCHEZ IS LAWFUL.

After Rodriguez issues the traffic ticket, Rodriguez' additional questioning of O. Talamante-Sanchez is lawful, because: (i) O. Talamante-Sanchez consents freely to additional questioning; and (ii) even if O. Talamante-Sanchez does not consent freely, Rodriguez extends the traffic stop lawfully, because he has reasonable suspicion that O. Talamante-Sanchez is engaged in criminal activity.  The initial traffic stop ends when Rodriguez issues O. Talamante-Sanchez the traffic ticket and tells him that he is free to go.  See United States v. Valdez, 685 F. Supp. 3d at 1158.  After that moment, the "traffic stop cannot be constitutionally prolonged unless '(1) the seized individual consents or (2) the officer has independent reasonable suspicion of criminal wrongdoing on behalf of the seized individual that justifies further investigation.'"  United States v. Gomez-Arzate, 981 F.3d 832, 839 (10th Cir. 2020)(quoting United States v. Cortez, 965 F.3d 827, 833 (10th Cir. 2020)).  First the Court discusses O. Talamante-Sanchez' consent to additional questioning.  Second, the Court discusses, in the alternative, Rodriguez' reasonable suspicion to extend the traffic stop.

### A.    O. TALAMANTE-SANCHEZ CONSENTS FREELY TO ADDITIONAL QUESTIONING.

O. Talamante-Sanchez consents freely to additional questioning, because a reasonable person in O. Talamante-Sanchez' position would believe he could refuse to answer additional questions.  "If an encounter between an officer and a driver ceases to be a detention and becomes consensual, and the driver voluntarily consents to additional questioning, no further Fourth

Amendment seizure or detention occurs." United States v. Bradford, 423 F.3d 1149, 1158 (10th Cir. 2005). "[C]onsent must be clear, but it need not be verbal. Consent may instead be granted through gestures or other indications of acquiescence, so long as they are sufficiently comprehensible to a reasonable officer." United States v. Guerrero, 472 F.3d 784, 789-90 (10th Cir. 2007). "The fundamental question we ask in these cases is whether 'a reasonable person under the circumstances would believe [he] was free to leave or disregard the officer's request for information.'" United States v. Gomez-Arzate, 981 F.3d at 842 (quoting United States v. Bradford, 423 F.3d at 1158. In addition to following "a bright-line rule that requires the driver's documents to be returned before the stop may be considered a consensual encounter," the Tenth Circuit identifies several relevant factors to this inquiry:

> "the location of the encounter, particularly whether the defendant is in an open public place where he is within the view of persons other than law enforcement officers; whether the officers touch or physically restrain the defendant; whether the officers are uniformed or in plain clothes; whether their weapons are displayed; the number, demeanor and tone of voice of the officers; whether and for how long the officers retain the defendant's personal effects such as tickets or identification; and whether or not they have specifically advised defendant at any time that he had the right to terminate the encounter or refuse consent."

United States v. Gomez-Arzate, 981 F.3d at 842 (quoting United States v. Spence, 397 F.3d 1280, 1283 (10th Cir. 2005)). "While this list is not exclusive and no one factor is dispositive, we focus on 'the coercive effect of police conduct, taken as a whole on a reasonable person.'" United States v. Gomez-Arzate, 981 F.3d at 842 (quoting United States v. Spence, 397 F.3d at 1283).

Considering these factors, the Court concludes that O. Talamante-Sanchez consents freely. Although O. Talamante-Sanchez is alone when Rodriguez, a uniformed officer, asks to speak more and waves his hand towards the inside of the patrol vehicle, Rodriguez does not touch O. Talamante-Sanchez, brandish a weapon, or withhold O. Talamante-Sanchez' documents unreasonably. See FOF Nos. 8-38, at 7-11. Rodriguez speaks in a calm and polite manner, is not

accompanied by other officers, and, after returning his documents, advises O. Talamante-Sanchez

that he is free to go.  See FOF Nos. 8-38, at 7-11.  Under these circumstances, O. Talamante-

Sanchez' mostly nonverbal consent -- when he nods his head and says, "uh-huh" from outside the

patrol vehicle after Rodriguez asks him if they can speak more and waves his hand inward, see

FOF Nos. 38-40, at 11 -- is valid and transforms the traffic stop into a consensual encounter.[5]  See

United States v. Gomez-Arzate, 981 F.3d at 843 (concluding that an encounter is consensual,

where the officer issues a traffic ticket, tells the defendant, through a language barrier, that he is

free to go, and then calls the defendant -- who has left the patrol vehicle and begun walking back

to his car -- back to the patrol vehicle and asks him if they can speak further); United States v.

Villegas, 554 F.3d 894, 897-99 (10th Cir. 2009)(concluding that an encounter is consensual and

that "consent was not rendered involuntary simply because Mr. Villegas had not completely exited

the patrol car when [the officer] made the request" to ask more questions and made a hand gesture,

which Villegas "interpreted as indicating that he should stop" exiting the vehicle).

---

[5]The Defendants insist that Rodriguez' additional questioning of O. Talamante-Sanchez is not consensual, because the translator "conveys [Rodriguez'] words to not be permissive but obligatory."  J. Talamante-Sanchez Motion to Suppress Reply at 2-3 (citing Translation Excerpts at 2).  Specifically, the Defendants argue that Rodriguez' statement, "okay, you can have a seat and we can talk some more" is translated improperly to a Spanish phrase meaning "you can take a seat, because he's going to talk to you there for a bit."  J. Talamante-Sanchez Motion to Suppress Reply at 2 (citing Translation Excerpts at 2).  This argument is not sound, however, because Rodriguez makes that statement after O. Talamante-Sanchez consents to additional questioning.  See FOF Nos. 38-41, at 11.  To obtain O. Talamante-Sanchez' consent, Rodriguez asks, in Spanish: "Puedo hablar contigo señor?  Puedo hablar mas?"  FOF No. 38, at 11.  The Defendants do not assert that Rodriguez chooses the wrong Spanish words here, and the Defendants agree that this phrase translates to: "Can I speak more with you sir?  Can I talk more?"  FOF No. 39, at 11.  Accordingly, the Court disagrees with the Defendants' translation-related arguments and concludes that, notwithstanding Rodriguez' broken Spanish, O. Talamante-Sanchez consents freely to additional questioning.

### B.    IN THE ALTERNATIVE, RODRIGUEZ HAS REASONABLE SUSPICION TO EXTEND THE TRAFFIC STOP WITH ADDITIONAL QUESTIONING.

In the alternative, if O. Talamante-Sanchez does not consent freely, Rodriguez' additional questioning is lawful, because Rodriguez has reasonable suspicion that O. Talamante-Sanchez is engaged in criminal activity.  Absent consent, continued detention is lawful "if, during the initial lawful traffic stop, the officer develops a 'reasonable suspicion' that the detained person is engaged in criminal activity."  United States v. Pettit, 785 F.3d 1374, 1379 (10th Cir. 2015)(quoting United States v. Bradford, 423 F.3d at 1156-57).  "For reasonable suspicion to exist, an officer 'need not rule out the possibility of innocent conduct'; he or she simply must possess 'some minimal level of objective justification' for making the stop."  United States v. Winder, 557 F.3d 1129, 1134 (10th Cir. 2009)(quoting United States v. Vercher, 358 F.3d 1257, 1261 (10th Cir. 2004)).  Information "falling 'considerably short' of a preponderance standard" will meet the standard for reasonable suspicion.  United States v. Winder, 557 F.3d at 1134 (quoting United States v. Arvizu, 534 U.S. 266, 274 (2002)).  "As long as an officer has 'a particularized and objective basis for suspecting an individual may be involved in criminal activity, he may initiate an investigatory detention even if it is more likely than not that the individual is not involved in any illegality.'"  United States v. Pettit, 785 F.3d at 1379-80 (quoting United States v. Johnson, 364 F.3d 1185, 1194 (10th Cir. 2004))(emphasis in United States v. Johnson, but not in United States v. Pettit).  "As courts have often repeated, the existence of objectively reasonable suspicion of illegal activity 'does not depend upon any one factor, but on the totality of the circumstances.'"  United States v. Simpson, 609 F.3d 1140, 1146 (10th Cir. 2010)(quoting United States v. Soto, 988 F.2d 1548, 1555 (10th Cir. 1993)).

Rodriguez has reasonable suspicion that O. Talamante-Sanchez is engaged in criminal activity, because he is nervous and evasive, contradicts his brother's story about their stay in

Gallup, and cannot provide his sister's address. Although "[o]rdinary nervousness alone cannot serve as the basis for reasonable suspicion," United States v. Pettit, 785 F.3d at 1380, "signs of nervousness beyond those normally anticipated during a citizen-police encounter," United States v. Salzano, 158 F.3d 1107, 1113 (10th Cir. 1998), may contribute to reasonable suspicion. "[V]ague, inconsistent or evasive answers with respect to travel plans [are] supportive of reasonable suspicion." United States v. Simpson, 609 F.3d at 1150 (brackets added).

Although O. Talamante-Sanchez is not shaking visibly during the initial traffic stop, O. Talamante-Sanchez is unusually nervous and slow to respond, has trouble providing clear answers, and asks Rodriguez to clarify his questions. See FOF No. 8-38, at 7-11. O. Talamante-Sanchez and J. Talamante-Sanchez also contradict each other about their stay in Gallup: O. Talamante-Sanchez says that they stayed with his sister, and J. Talamante-Sanchez says that they stayed with their aunt. See FOF Nos. 25-32, at 9-10. O. Talamante-Sanchez also cannot provide his sister's address. See FOF No. 25, at 9. Considering the totality of the circumstances, the Court concludes that, by the time Rodriguez concludes the traffic stop, Rodriguez has reasonable suspicion that O. Talamante-Sanchez is engaged in criminal activity. See United States v. Pettit, 785 F.3d at 1381 (concluding that the district court "properly considered" the detainee's nervousness "alongside other relevant factors in finding the trooper had reasonable suspicion to extend the traffic stop"); United States v. Karam, 496 F.3d 1157, 1164 (10th Cir. 2007)(concluding that a defendant's "less than clear" answers about his travel plans contribute to reasonable suspicion); United States v. Farmer, 215 F.3d 1338, at *7 (10th Cir. 2000)(unpublished)(concluding that a detainee's "inability to provide an address or telephone number" for "the nephew he claims he was going to stay with that night" contributes to reasonable suspicion); United States v. Mendez, 118 F.3d 1426, 1432 (10th Cir. 1997)(concluding that a

detainee's inability to provide his sister's address -- which he represents is his destination -- contributes to reasonable suspicion); United States v. Kopp, 45 F.3d 1450, 1454 (10th Cir. 1995)(concluding that a passenger's explanation of travel plans contributes to reasonable suspicion, where the explanation is not "completely consistent with the explanation his passenger gave"). Thus, even if O. Talamante-Sanchez does not consent freely, Rodriguez' additional questioning is lawful.

III.    **THE VEHICLE SEARCH IS LAWFUL.**

The vehicle search is lawful, because O. Talamante-Sanchez consents voluntarily to a full search of the truck. "[A] vehicle may be searched if a person in control of the vehicle has given his voluntary consent to the search." United States v. Zubia-Melendez, 263 F.3d 1155, 1162 (10th Cir. 2001). The Tenth Circuit uses a two-part test for voluntary consent to search: "(1) the law enforcement officers must receive either express or implied consent and (2) the consent must be freely and voluntarily given." United States v. Jones, 701 F.3d 1300, 1317 (10th Cir. 2012). The Court addresses each prong in turn.

A.    **O. TALAMANTE-SANCHEZ CONSENTS EXPRESSLY TO A FULL SEARCH OF THE TRUCK.**

On the first prong, O. Talamante-Sanchez consents expressly to a full search, which includes dismantling the truck and using a portable x-ray machine. A driver provides express consent when he gives an officer verbal permission to search a vehicle. See United States v. Latorre, 893 F.3d 744, 756 (10th Cir. 2018). Rodriguez asks O. Talamante-Sanchez, in English, if he can search the truck: "Can I search your truck, and your belongings in the truck?" FOF No. 48, at 12. The translator translates that statement to: "Puedo revisar tu troca y puedo revisar tus pertenencias en la troca?" FOF No. 49, at 12. The translator's translation means: "Can I look through your truck and can I look through your belongings in the truck?" FOF No. 50, at 12.

O. Talamante-Sanchez' response, translated from Spanish to English, is: "Yes, the bag is there, is there in the backseat."  FOF No. 52, at 12.  When O. Talamante-Sanchez says, "yes," he provides express consent.  See United States v. Latorre, 893 F.3d at 749, 756 (determining that the defendant "gave the law enforcement officers express consent," where the law enforcement asks the defendant "for permission to search his aircraft, and Latorre replied, 'Yeah, I don't mind'").

Instead of disputing whether O. Talamante-Sanchez consents expressly, the Defendants argue that the search exceeds O. Talamante-Sanchez' consent, because: (i) O. Talamante-Sanchez consents only to a search of his bags, and (ii) even if O. Talamante-Sanchez consents to a search of the truck, that consent does not include dismantling the car or using a portable x-ray machine.  See J. Talamante-Sanchez Motion to Suppress at 13-15; J. Talamante-Sanchez Motion to Suppress Reply at 4-5.  The Court disagrees with both arguments and concludes that the officers do not exceed O. Talamante-Sanchez' consent when they search the truck, partially dismantle it, and use a portable x-ray machine to search for drugs.

On the first argument, the Defendants assert that, when the translator translates Rodriguez' question -- "can I search your truck, and your belongings" -- the translator speaks too quickly, and O. Talamante-Sanchez does not hear her say the Spanish-equivalent of the word "and." J. Talamante-Sanchez Motion to Suppress Reply at 4.  The Defendants argue that, without this allegedly essential "and," O. Talamante-Sanchez understands Rodriguez' question as "can I search your truck, your belongings," and, thus, his affirmative response provides consent to search only his belongings  J. Talamante-Sanchez Motion to Suppress Reply at 4.  This argument is not persuasive for two reasons.  First, the translator audibly says the Spanish-equivalent of the word, "and."  FOF No. 49, at 12.  The Defendants do not cite any authority, and the Court is not aware of any authority, suggesting that, if a law enforcement officer speaks quickly, a defendant may

excise short words from the officer's statement when evaluating the scope of consent.  Thus, when O. Talamante-Sanchez responds affirmatively -- "yes, the bag is there, is there in the backseat" -- to Rodriguez' request --"can I search your truck, and your belongings" -- O. Talamante-Sanchez consents to a full search of the truck, because he does not limit that search to his belongings.  See United States v. Gomez-Arzate, 981 F.3d at 836-37 (concluding that a driver consents to a full search of his vehicle after the officer asks "can we check the car and your -- your things" and the drivers responds "yes, you can check"); United States v. Wacker, 72 F.3d 1453, 1470 (10th Cir. 1995)(holding that, "where a suspect does not limit the scope of a search, and does not object when the search exceeds what he later claims was a more limited consent, an officer is justified in searching the entire vehicle").  Second, even if the translator does not say the Spanish-equivalent of the word "and" slowly enough for O. Talamante-Sanchez to understand her, that hypothetical sentence -- "Can I search your truck, your belongings?" -- is not a request to search only O. Talamante-Sanchez' belongings.  That hypothetical sentence is, like the actual sentence, a request to search both the truck and O. Talamante-Sanchez' belongings in the truck.  Moreover, O. Talamante-Sanchez quells any confusion about the scope of his consent when he does not stop Rodriguez from searching the truck.  See United States v. Gonzalez-Ruiz, 794 F.3d 832, 836 (7th Cir. 2015)(concluding that "any residual ambiguity" regarding the defendant's nonverbal consent to search his car "was eliminated when [the officer] began the search and Gonzalez-Ruiz did not object"); United States v. Teston, No. CR 22-1400 JB, 2023 WL 5567356, at *12 (D.N.M. Aug. 28, 2023)(Browning, J.)(noting that, "if a suspect fails to object to the officer's search, it indicates that 'the search was within the scope of consent'")(quoting United States v. Gordon, 173 F.3d 761, 766 (10th Cir. 1999)).  Thus, the Court concludes that O. Talamante-Sanchez provides express consent to search the truck, and he does not limit that consent to search only his belongings.

The Defendants' second argument regarding O. Talamante-Sanchez' consent to search the truck -- that, even if O. Talamante-Sanchez consents to search the truck, he does not consent to the officers dismantling the car or using the portable x-ray machine -- is also not sound, because "[g]eneral permission to search a vehicle usually extends to its entirety, absent objection or limitation by the driver." United States v. Gregoire, 425 F.3d at 880. Officers searching a car "under a grant of general consent" may dismantle a car so long as the car is not "destroyed or rendered [] completely useless." United States v. Gomez-Arzate, 981 F.3d at 836-37, 844-45 (holding that the officers who "removed the air filter, took items out of the trunk, and removed and replaced the fender" do not exceed the scope of the defendants' consent, where the officer asks "can we check the car and your -- your things," the driver responds "yes, you can check," and the occupants do not object during the search). Here, the officers do not render the truck completely useless when they partially dismantle it and use a portable x-ray machine. See FOF Nos. 65-69, at 14. Moreover, the Defendants do not stop the officers while they gut the truck. See FOF No. 70, at 70. Thus, the officers do not exceed the scope of O. Talamante-Sanchez' general consent when they partially dismantle the truck and use a portable x-ray machine. See United States v. Mendoza, 817 F.3d 695, 701 (10th Cir. 2016)(holding that an officer does not exceed the scope of a general consent to search a cooler when he pries apart the cooler's lining to search for drugs); United States v. Gregoire, 425 F.3d at 880 (holding that an officer does not exceed the scope of general consent to search a vehicle, where the officer's search "began with the drilling of two holes in the interior and concluded with a large screwdriver used to pry away a portion of the undercarriage of the vehicle to reveal the contraband"); United States v. Lyons, 510 F.3d 1225, 1232, 1240 (10th Cir. 2007)(concluding that a driver's consent to an officer's request to "look in the back" permits the officer conduct an "echo test" on a spare tire attached to the car's undercarriage, which "involves

hitting it with an object and noting the sound" with a stethoscope); United States v. Camacho, 368

F.3d 1182, 1185-86 (9th Cir. 2004)(concluding that an officer may use a radioactive density

measuring device on a spare tire without reasonable suspicion); United States v. Long Tien Dang,

No. 05-40073-01-RDR, 2012 WL 1416680, at *1, 8 (D. Kan. April 24,

2012)(Rogers, J.)(concluding that "a defendant's consent to 'take a quick look in the car'"

authorizes an officer to use a density measuring device on a car's exterior panels).

### B.    O. TALAMANTE-SANCHEZ CONSENTS FREELY TO A FULL SEARCH OF THE TRUCK.

On the second prong of the Tenth Circuit's voluntary consent test, the Court concludes that

O. Talamante-Sanchez consents freely, because Rodriguez does not coerce O. Talamante-

Sanchez. "Whether consent is voluntary is 'determined by the totality of the circumstances,'" and

"an individual may voluntarily consent to a search even though he is detained." United States v.

Davis, 636 F.3d 1281, 1292 (10th Cir. 2011)(quoting United States v. Zubia-Melendez, 263 F.3d

at 1162).

> When considering the totality of the circumstances, some of the relevant considerations include:
>
>> "physical mistreatment, use of violence, threats, promises, inducements, deception, trickery, or an aggressive tone, the physical and mental condition and capacity of the defendant, the number of officers on the scene, and the display of police weapons. Whether an officer reads a defendant his Miranda rights, obtains consent pursuant to a claim of lawful authority, or informs a defendant of his or her right to refuse consent also are factors to consider in determining whether consent given was voluntary under the totality of the circumstances."

United States v. Jones, 701 F.3d at 1318 (quoting United States v. Harrison, 639 F.3d 1273, 1278

(10th Cir. 2011)).    Previously in this Memorandum Opinion, the Court concludes that

O. Talamante-Sanchez consents freely to additional questioning after the initial traffic stop

concludes. See supra, at 61-64. For similar reasons, the Court concludes that O. Talamante-

Sanchez consents freely to the full vehicle search. By the time O. Talamante-Sanchez tells Rodriguez that he can search the truck, the scene has not changed much. Although Rodriguez does not read O. Talamante-Sanchez his <u>Miranda</u> rights, he is not accompanied by other officers, he does not brandish his weapon, he does not withhold O. Talamante-Sanchez' documents, he has told O. Talamante-Sanchez that he is free to go, and he speaks in a calm and polite manner. <u>See</u> FOF Nos. 8-48, at 7-12. Under these circumstances, O. Talamante-Sanchez provides his consent freely. <u>See</u> <u>United States v. Gomez-Arzate</u>, 981 F.3d at 836-37, 844 (concluding that "there is no indication that the deputies had applied coercive measures" to obtain consent to search a vehicle, where two officers ask a driver and his passenger for permission to search a car and the occupants' belongings after conducting an approximately fifteen-minute traffic stop and then consensually questioning each occupant for approximately fifteen minutes on the side of I-40 in Bernalillo County, New Mexico); <u>United States v. Latorre</u>, 893 F.3d at 757 (concluding that "consent was freely and voluntarily given," where the officers do not touch their weapons, threaten the defendant, make promises, or withhold documents before asking if they can search the defendant's plane). Accordingly, the Court concludes that Rodriguez, Sanchez, and Jackson do not violate the Defendants' Fourth Amendment rights when they partially dismantle the truck and use a portable x-ray machine during the consensual search.

**IT IS ORDERED** that: (i) the Defendant Obeth Sanchez's Opposed Motion to Suppress Evidence, filed March 21, 2025 (Doc. 35), is denied; and (ii) the Defendant Jose Talamante-Sanchez' Motion to Suppress Evidence, filed June 23, 2025 (Doc. 51), is denied.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Ryan Ellison
  United States Attorney
Timothy S. Vasquez
Rachel Eagle
  Assistant United States Attorneys
United States Attorney's Office
Albuquerque, New Mexico

      *Attorneys for the Plaintiff*

Margaret Katze
  Federal Public Defender
Buck T. Glanz
  Assistant Federal Public Defender
Office of the Federal Public Defender
Albuquerque, New Mexico

      *Attorneys for Defendant Obeth Talamante-Sanchez*

Sarah M. Gorman
Law Office of Robert D. Gorman, P.A.
Albuquerque, New Mexico

      *Attorneys for Defendant Jose Talamante-Sanchez*